JAMES M. CROSS, respondent agt. AMOS M. SACKETT, MOSES L. HOLMES, JOHN D. MAXWELL, HENRY W. BELCHER, FRANKLIN OSGOOD, SAMUEL SMITH, ISAAC H. SMITH and NATHANIEL H. WOLFE, appellants.

There is no wrong or fraud, which directors of a joint stock company, incorporated or otherwise, can commit, which cannot be redressed by appropriate and adequate remedies.

The first mode is when the *company* in its corporate name, seeks to set aside the fraud, to reclaim abstracted property, or prevent a corporate loss.

The next mode is, when *shareholders* bring an action for the same object, unitedly or in the form which the court of chancery permits, of a bill by one or more on behalf of themselves and all others having a common interest. This right exists under various circumstances. It clearly exists, when the directors or agents

Cross agt. Sackett and others.

whose deeds or omissions are impeached, do themselves control the company, and impede the assertion of a right in its own name.

And where a party projects and publicly promulgates the scheme of a joint stock company; when he causes the usual books to be opened, and allows or causes the inscription of a person as an owner of an interest to a definite amount and value therein, which is *false* within his own knowledge; when he embodies such false statements in a certificate of this right directly issued, and of the same effect as if signed by himself; when he accompanies that certificate by a written power, authorizing a transfer at large by the party to whom he has given the certificate; when that representation publicly addressed to all, induces an innocent person to advance his money, the defendant's own individual act has created a privity of contract, and he must be held responsible to any one who has been deceived. (*See also Mead agt. Mali and Jewett*, 15 *How.* 347.)


*General Term, February*, 1858.

*Before* BOSWORTH, HOFFMAN, SLOSSON, WOODRUFF *and* PIERREPONT, *Justices.*

UPON demurrer to complaint. Appeal from an order for judgment for the plaintiff upon a demurrer, unless the defendants answer the complaint in the time prescribed, and pay the costs.


CHARLES O'CONOR, *for defendants and appellants.*
DANIEL LORD, *for plaintiff and respondent.*


By the court—HOFFMAN, Justice. The complaint contains the following statements: That on the 13th of August, 1853, the defendant Holmes, entered into a written agreement with the defendants *Sackett, Maxwell, Belcher, Osgood and Samuel Smith*, by which he sold to the last named parties, all the estates, mines, fixtures and property described and set forth in a schedule declared to be annexed.

The consideration for this sale was to be as follows: Upon the receipt of the leases described in the schedule, and delivery of the personal property therein mentioned, $60,000 was to be paid. On the 20th of September ensuing, upon receipt of the deeds of all the estates mentioned in the schedule, conveying unquestionable titles, (except as to $125,000 incumbrances,) the further sum of $91,600 was to be paid; and thirty thou-

sand shares of stock of the Gold Hill Mining Company, was also to be delivered to him.

This instrument declares, that the Gold Hill Mining Company was a company proposed to be formed upon the basis of the property therein mentioned. That property was to be divided into and represented by 200,000 shares, the par value to be five dollars a share. Fifty thousand shares were to be reserved as a capital by the company, and to provide for the payment of the $125,000 before stated.

*Holmes*, then the owner of the property to be conveyed, consents to sell the whole of it for the price in cash of $151,600; and of stock to be given him in the proposed company of thirty thousand shares, the par or arbitrary value of which was to be five dollars a share, or $150,000. The incumbrances amounted to $125,000. Taking the value of $150,000 of stock, at the nominal amount, the estimate, excluding incumbrances, was $301,600.

And the complaint alleges, that the actual value of the property did not exceed $375,000, when wholly unincumbered, and was not worth more than $250,000 beyond the incumbrances.

On the 30th of August, 1853, the defendants *Samuel Smith*, *Osgood* and *Holmes*, executed a certificate of organization, under the act of February 7th, 1848, for the formation of corporations for mining, mechanical and chemical purposes, as such act was amended by the statute of June 7th, 1853. The certificate stated the corporate name, the object, the capital, one million of dollars; the duration, twenty-five years, and the *number of* shares, two hundred thousand. The trustees for the first year were the present defendants, except the defendant Maxwell.

This instrument was acknowledged on the 31st of August, 1853, and filed in the office of the clerk of the county, on the 3d of September, of that year.

On the 31st of August, 1853, the defendants *Sackett, Maxwell, Osgood, Holmes, Belcher and S. Smith*, executed an instrument, by which they assigned to the Gold Hill Mining Company, the contract or obligation of Holmes, and agreed to pay Holmes

all the money stipulated to be paid to him in such contract, except the $125,000, the amount of the old incumbrances. They also agreed to deliver to Holmes the thirty thousand shares of the company. The consideration for this transfer was sixty thousand shares of the company, acknowledged to have been received, and ninety thousand shares to be delivered on or before the 20th of September ensuing.

On the same 31st of August, the defendants acting as a corporation, by the name of the Gold Hill Mining Company, accepted and agreed to the purchase, upon the terms expressed in the foregoing instrument. And on the 1st of September, 1853, Holmes executed an instrument, by which he agreed to sell and convey to the Gold Hill Mining Company, the property specified. It consists of various leases, steam engines, pumps, fixtures, &c., with certain parcels of real estate in fee. No consideration is expressed in it.

It may here be observed, that the counsel of the plaintiffs has treated the case as if there had been a company completely organized on the 31st of August, although the certificate was not filed until the 1st of September. Pausing at this stage of the facts, we find that the company had become vested with the whole of the estate and rights of Holmes, and of the five other parties, in the whole property. For this the company was bound to pay one hundred and fifty thousand shares of its stock, taking it subject to $125,000 of old incumbrances. Holmes had the personal engagement of *Maxwell, Osgood, Sackett, Belcher and S. Smith*, to pay him $151,600 in cash, and to deliver him thirty thousand shares of the stock of the company. Thus the property which was to cost the five parties $151,600 in cash, and thirty thousand shares nominally $150,000, is put into the company at $750,000 nominal value. It is to be paid for at that estimate, and by the issue of stock.

The complaint then states, that certificates were then printed and issued by the defendants, stating that the party named was entitled to the specified number of shares in the capital stock; that such capital consisted of one million of dollars, and the shares were two hundred thousand of $5 each. The complaint

further states the issuing of shares of stock to the defendants at different periods, and in different amounts, in the aggregate one hundred and forty-five thousand shares. Certificates were also issued to persons other than the defendants, (except 300 to Sackett,) to the amount of nine thousand three hundred shares. The total issue was therefore $154,600 shares. Forty-five thousand four hundred shares were reserved, and apparently under the provision that 50,000 shares were to be a capital to provide for the incumbrances of $125,000.

The complaint proceeds to state a custom in the city of New-York, of attaching a skeleton power of attorney to certificates of stock issued by such corporations, enabling a transfer of a right to the stock to be made without an entry on the books, the knowledge by the defendants of such custom, their attaching such powers of attorney to the certificates, and that they knew and intended that such certificates would thus become easily current and negotiable as evidences of property and subjects of traffic from hand to hand, without recourse to the books of the company.

Another allegation of the complaint relates to a public declaration of dividends for two months, as out of the profits of the concern, caused to be made and published by the defendants, in order to give a fictitious value to the stock, when they well knew that the company had not received any such profits. And as to two of such dividends, it is alleged, that a large part of such dividends was paid out of money borrowed, or out of the capital stock.

The complaint then alleges, "that on the 14th of April, 1854, by means of such false and fraudulent practices and statements of the defendants, it had come to be generally believed in the city of New-York, and was believed by the plaintiff, that the said Gold Hill Mining Company was in fact possessed of property of at least one million of dollars in value; that shares and interests therein were of the value of at least $5 a share, and that such company had earned at least the sum of $50,000 over expenses; that the certificates issued by the defendants with the powers of attorney attached, were in circu-

Cross agt. Sackett and others.

lation and course of sale, pledge and disposition, and were believed by the plaintiff to be true and genuine evidences or representatives of actual interests in a capital of one million of dollars ; and so believing, and on the faith and credit of the aforesaid false and fraudulent acts and representations of the defendants, (of the falsity and fraud whereof the plaintiff was ignorant,) he did on the 14th of April, 1854, purchase of one Richard Schell, then being the holder of one of the original or substituted certificates, an interest in the said capital stock, to the extent of one thousand shares, and paid therefor the sum of $3,500. That he received a certificate and power from Schell, which he surrendered to the company, and received in lieu thereof, from the defendants, another certificate representing the capital as aforesaid, and that the defendants transferred 1,000 shares to him on the books; that the statements and representations were false, and that the interest supposed to have been acquired by him, was, in fact, worthless; that by means of such false, fraudulent and deceptive practices of the defendants, the said plaintiff has sustained damage to the amount of $6,000, for which he demands judgment."

Such is the substance of the case made by the plaintiff; and my first subject of inquiry shall be, what did the certificates issued by the defendants in their corporate name purport to represent ? What under the statute of organization, ought they by law to have represented ? and what was the truth in relation to such representations ?

The representation on the certificate with its attendant power was, that the party named in it was entitled to an interest proportionate to the whole stock in a money capital, or in property equivalent substantially to a money capital, of one million of dollars. This is the statement made and uttered by the defendants, with an implied engagement for its truth, upon these instruments. And this is precisely what under their charter they were allowed and directed to represent; and they could only comply with the act of the legislature, when such was the representation, and when it was true.

The 14th section of the act of 1848, (*Sess. Laws, p.* 54,) de-

clared, that ".nothing but money should· be considered as pay-
ment of any part of the capital stock." The act of 1853, (*Sess.
Laws*, 705,) provided, " that the trustees may purchase mines,
manufactories and other property necessary for their business,
*and issue stock to the amount of the value thereof in payment there-
for*, and the stock so issued, shall be taken as full stock." It
is to be reported not as cash paid into the company, but ac-
cording to the fact.

We accede to the proposition of the counsel of the plaintiff,
that the legislature in substituting mines and· other ;property
for the money capital before prescribed, intended and declared
that such property should have an actual value reasonably pro-
portionate to the stock issued to pay for it. Nothing. else is
consistent with the honest purposes of such an association, and
nothing else can have been the legislative will. But what did
these ·certificates in truth represent ? What, for example, was
the fact as the complaint states it, as to the certificate of 1,000
shares purchased by the plaintiff ? Instead of an interest in
five thousand dollars of money, once contributed and presumed
to subsist in some form of value, ;or in mines and property of
an equal. or substantially equal value, he got, what he alleges
to be wholly worthless, and which upon any calculation on the
statements made, must be of greatly inferior value.

We are bound to assume the allegations of this complaint to
be true in all their reasonable and legal import; and if so, a case
is presented of the formation of a bubble company, contrived
for purposes of private emolument, its authors and managers
fraudulently publishing.statements tending to produce the belief
that the stock was at least of its par value; that its business
had warranted successive dividends from profits; that these
false and deceptive representations were made by the defend-
ants, the authors or managers of the scheme ; that they were
made in. such an apparent form of negotiability, as from the
custom of business, was peculiarly calculated to delude and to
injure; and that such delusion and injury has actually been
produced and fallen upon the plaintiff, in consequence of such
.acts. We may here observe that some of the acts of fraud are

stated to have been performed before the company was organized; and as to two of the defendants, it is not said that they originally participated in them. But as to the frauds stated to have been subsequently practiced, it is to be observed that all the defendants acted together, and "did so, well knowing the premises." This is sufficient to render them as responsible by the adoption, as the others are by their performance of the acts.

The learned counsel of the defendants has pressed upon us the proposition that such a suit as this has been unknown through all the periods of the law, except when it was warranted by the statute of George Ist, (*cap.* 18, § 20, 1719,) consequent upon the South Sea bubble. He insists, "that because the common law afforded no remedy to the remote purchaser, this statute was passed, giving in the 20th section an action for damages."

He has called our attention to the history of those gigantic frauds which have acquired an immortality of pre-eminence, amid the destructive projects of the visionary or the designing, the Mississippi and the South Sea schemes. A member of Parliament when the act of George the First was discussed, admitted, "that the directors could not be reached by any known law; but extraordinary crimes called for extraordinary remedies. The Roman lawgivers had not foreseen the possibility of a parricide, but as soon as the first monster appeared, they found a law, he was sewn in a sack and cast into the Tiber." (*Lord Mahon's History, Vol. I, p.* 280.)

But I cannot believe, that either the argument of the learned counsel, or the declamation of the rhetorician of the House of Commons is sufficient to stamp the law of England with the impotency attributed to it. On the contrary, I consider that there have always been principles of law, and tribunals adapted and competent to redress wrongs of this nature.

The act of George Ist was annulled in the 6th year of Geo. IVth, (1825.) The 19, 20 and 21st sections were recited and repealed with this declaration: "And whereas it is expedient that so much of the above act as is above set forth,

should be repealed, and that the said undertakings, attempts, practices and acts should be adjudged and dealt with, according to the common law, notwithstanding such act. Therefore, &c."

We may assume that the Parliament thought there was some mode of dealing with such fraudulent practices, as the 20th section of the act had aimed at, according to the doctrines of the common law, and through some of the methods of redress it had supplied. In *The Charitable Corporation* agt. *Sutton*, (2 *Atk. R.* 401, 1742,) Lord HARDWICKE announced as an unquestionable principle, that a court of chancery could give relief against all who are constituted, expressly or by operation of law, trustees or agents, to parties injured by their acts.

In the case of *Hayes* agt. *Morgan*, (*April*, 1857,) I had occasion to consider the following cases : ˙ *Hitchins* agt. *Congreve*, (4 *Russell* 512 ;) *Walburn* agt. *Ingilbey*, (1 *Milne & Keene*, 61 ;) *Foss* agt. *Harbottle*, (2 *Hare*, 401 ;) *Dodge* agt. *Woolsey*, (18 *How. U. S. R.* 33,) and *Robinson* agt. *Smith*, (3 *Paige*, 230.) The law which may be gathered from these cases is, that there is no wrong or fraud which directors of a joint stock company, incorporated or otherwise, can commit, which cannot be redressed by appropriate and adequate remedies. The first mode is, when the company in its corporate name, seeks to set aside the fraud, to reclaim abstracted property, or prevent a corporate loss. Such is the case of *The Corporation* agt. *Sutton*, and the recognized rule in *Foss* agt. *Harbottle*. The next mode is, when shareholders bring an action for the same object, unitedly or in the form which the court of chancery permits, of a bill by one or more on behalf of themselves and all others having a common interest. This right exists under various circumstances. It clearly exists when the directors or agents whose deeds or omissions are impeached, do themselves control the company, and impede the assertion of a right in its own name.

I may particularly notice the case of *Walburn* agt. *Ingilbey*. It was against the directors of an incorporated joint stock company, by a holder of shares. The company was for working

mines in Peru. The advertisement was of a capital of $1,000,000, in 20,000 shares of $50 each. The defendants were the original directors, and still continued to be such. The bill stated various acts by which the property of the company was abstracted and appropriated to the defendant's use. It also set forth, that the plaintiff purchased at various times, from different persons, 2,000 shares, and was the holder thereof. The bill was sustained in every point raised against it, except for not stating the manner in which the plaintiff had acquired title to shares purchased from others. The bill showed that no transfer was valid without the approval of the board. This was held to be a condition precedent, and to be stated. It was framed to get back money for the general fund.

But another question, and close to the present, arises, when an individual claims redress in his own name, solely on his own account, for a fraud practiced by a trustee or director of an association, from which he has suffered loss; when, although his claim is founded precisely upon the same facts and relations as many others, yet as his injury and loss is disconnected and peculiar, he seeks to assert his right alone.

The old case of *Colt* agt. *Wollaston*, (2 *P. Wms.* 154,) is an example of this character. The plaintiff sought by his bill to be repaid two sums of money advanced to the defendants, as managers and projectors of a bubble called The Land Security and Oil Patent, for the purpose of extracting oil from radishes. There were two plaintiffs, and they had purchased six shares each. The company was to have a capital of £100,000. The shares to be 5,000 at £20 each. Wollaston bought an estate for £31,800, which was under mortgage for £28,000, and he was to be paid £57,000 out of the fund. It was represented by the defendants to be a most advantageous project. The master of the rolls said: " This is an imposition to propose the surplus of the value of an estate, (which cost but £31,800,) after £85,000 charged upon it, more than double its value, as a security to the contributors, who laid out their money upon this project; it is giving them moonshine instead of anything real."

" It is no objection that the parties have their remedy at law, and may bring an action for money had and received; for in case of fraud, a court of equity has a concurrent jurisdiction with a court of law." The decree was for payment of the money paid, interest and costs.

In *Green* agt. *Barrett*, (2 *Simons Rep.* 45,) the plaintiff was a shareholder, and the defendants directors of a company called the Imperial Distillery Company. The bill was to recover a deposit of £100, which he had paid upon 20 shares allotted to him. His communications were with the secretary and bankers of the company. But a circular or prospectus had been issued by the directors, on which he much relied. The nature of the bill is thus stated by the vice-chanceller: " The prospectus of this undertaking was published, not with any intention to establish a company on the principles there stated, but as a snare to persons who might unwarily become subscribers, and for the purpose of enabling the directors to make a profit by the sale of shares, which they saw fit to assume to themselves. It appears to me the case is governed by that of *Colt* agt. *Wollaston*, and upon that authority, I overrule the demurrer."

In *Jones* agt. *Garcia Del Rio*, (1 *Tur. & Rus.* 297,) where the bill proceeded upon similar grounds of fraud, three persons filed it as shareholders, on behalf of themselves and others, to have their subscriptions returned. The case came up on an injunction, and a motion to dissolve it after answer. The answer set up, that many of the shareholders who were in the same situation as the plaintiffs, were content to abide by the contracts.

The lord chancellor said, that the plaintiffs, if they had any demand at all, had each a demand at law, and each a several demand in equity ; that they could not file a bill on behalf of themselves and the other holders of scrip ; as they were unable to do that, they could not, having three distinct demands, file one bill. In *Blair* agt. *Adair*, (1 *Simons*, 37, 2 *Id.* 289,) the bill was by five persons, on behalf of themselves and numerous others, parties to an indenture, by which a large num-

ber of shares had been assigned to the five. It was in trust, with a power of attorney to sue, obviously to avoid the difficulty of making all parties. The allegations were of a deceptive prospectus caused to be printed and published by the directors, and other acts of fraud in misapplying the deposit money, &c. The bill also showed, that some of the original shareholders had transferred their shares to others, and some of the former with the latter, united in the assignment to the plaintiffs. The vice-chancellor overruled a demurrer for want of equity, but sustained one *ore tenus* for want of parties, holding that the assignors must be on the record. The bill was then amended, and the assignment left out, and naming three other shareholders as parties, stating that they held some of the shares by original purchase, and some by transfers made to them by other shareholders. A general demurrer was taken for want of equity, and one taken *ore tenus* for want of parties.

The vice-chancellor (SHADWELL) held, that this was a case of fraud, which a court of equity could relieve as well as a court of law, and cited and approved of *Colt* agt. *Wollaston*. He held that the plaintiffs in their capacity as original shareholders, could sustain the bill, but not as purchasers from prior purchasers. An objection for want of parties was overruled, the bill stating that the plaintiffs did not know the names of the other shareholders. When we consider the arguments of counsel, (Mr. Sugden,) it will appear, that the objection was on the ground, that the case could not proceed without the assignors of the scrip being brought in, and upon nothing else.

The case at common law *Gerhard* agt. *Baley*, (20 *Eng. C. L. R.* 130,) has been much criticised by counsel. The second count in that case was sustained by the court, and when analyzed it presents this case. That the defendants and others unknown, had formed a company for the purpose of smelting and refining the ores of certain mines in Spain, and divided it into 96,000 shares of £1 each, out of which 12,000 shares were to be appropriated to the public at 12s. 6d. each, free from further calls; that such 12,000 shares were actually offered to the public: that the defendant was promoter and managing

director, and being such, on the day of, &c., intending to defraud, deceive and injure the public, and to cause it to be publicly advertised and represented, that the company was likely to be a safe and profitable undertaking, and also to deceive the public who might become purchasers of the said 12,000 shares, and to induce them to become such purchasers, falsely, fraudulently and deceitfully, procured and caused it to be publicly made known and advertised by a certain prospectus issued by the defendant as such director, that the promoters did not hesitate to guaranty to the bearers of the 12,000 shares a minimum dividend of £33 per cent. payable half yearly, to remain in force until the 12s. 6d. a share should be paid. That the defendant by *means of such false and fraudulent pretences and representation*, after the making the same, wrongfully and fraudulently induced the plaintiff to become the purchaser and bearer of 2,500 of the said 12,000 shares, and that he paid 12s. 6d. for each share ; that in truth, the statement was false.

Lord CAMPBELL said, " that had the declaration been, that the defendant *delivered* the prospectus to the plaintiff, containing the false representation, there could be no question in the case. If the plaintiff had only averred further, that having seen the prospectus he was induced to purchase the shares, objection might be made that a connection did not sufficiently appear between the act of the plaintiff and the act of the defendant; but the count goes on to aver that the defendant by means of the said false and fraudulent representations, wrongfully and fraudulently induced the plaintiff to become the purchaser and bearer," &c. Judgment was given for the plaintiff on this count.

I may observe that the inducement to purchase was a false representation of the defendant. *By means* of that the plaintiff was deceived, and that false representation was contained in a prospectus issued by the defendant; but as his lordship impliedly admits, *not delivered* to the plaintiff by the defendant. It appears to me, this means simply that the fact of a prospec-

tus issued by the defendant, inducing the plaintiff to purchase, and being false and fraudulent, was enough.

In the course of the argument, Justice COLERIDGE said: "It is a continuing representation to the public, and amounts to a representation to whomsoever shall hold shares." (*See also The National Exchange Co.* agt. *Drew*, *in the House of Lords*, 32 *Eng. L. & Eq. Rep. p.* 10.)

The proposition of the defendants' counsel, that the action can only exist, if at all, in favor of one to whom the false and fraudulent statement has been directly made, and his reasoning to support it is similar to that of Justice SELDEN, in *The Farmers & Mechanics' Bank* agt. *The Butchers & Drovers' Bank*, (*court of appeals, December*, 1857.) He cites the cases of *Grant* agt. *Norway*, (1 *Com. Bench R.* 323 ;) *Coleman* agt. *Riches*, (29 *Eng. L. & Eq. R.* 323,) and *The Mechanics' Bank* agt. *The N. Y. & N. H. R. R. Co.*, (3 *Kernan Rep.* 599.) He says : "They are plainly distinguishable from the case before the court. In neither of these cases was the document upon which the question arose negotiable. It was sought there to make the principal responsible for a false representation of the agent; not (responsible) to the person to whom the representation was made, but to one with whom the agent had no dealings, and to whom he had made no representation."

But a great distinction exists between the present case and that of *The New Haven R. R. Co.*, or that of *The Farmers & Mechanics' Bank*, connected with this question of a transferred responsibility. In each of these cases the directors of the companies were wholly innocent, they were themselves the victims of a misplaced confidence. But here the instrument set forth by the directors was framed by themselves; if it was false, the falsehood was their own, and the imposition it produces must be treated as the result of their own deceptive practices. *Grant* agt. *Norway*, commented upon by the learned justice, is fully stated by Justice BOSWORTH and Justice COMSTOCK, in *The New-Haven R. R. case.* There the immediate holder of a bill of lading, had no right of action, the goods not being put on board the vessel. The master as agent of the owners, had

not conferred any right of action upon the party to whom he gave the false bill of lading. So in *Colman* agt. *Riches*, (29 *Eng. L. & Eq. Rep.* 323,) the false receipt was given by Bond, the agent of the defendant, to Lewis, and Lewis obtained money on it from the plaintiff. It was a receipt given by the keeper of the defendant's wharf, when the goods had not been received, and the plaintiff was defeated.

It is true WILLIAMS, Justice, said: "Suppose Riches himself, had given the fraudulent receipt, would that have constituted a representation by Riches to Colman?" This seems to me the nearest approach to the proposition that the false representation of the *principal himself* to one party who could support an action, is unavailing in favor of another, to whom that party has transferred fully the subject matter of the action, in respect to which the representation was made. But as I understand the opinion of the court, this suggestion is contradicted. The court say: "There was no evidence from which it could be inferred as between Colman and Riches, (plaintiff and defendant,) that Riches agreed to give the vendee of corn, vouchers of the delivery, on which the vendee should act. Had there been such an agreement, it would have made the case very different, because Riches then would have undertaken to deliver vouchers to Colman, and to employ proper persons to give such vouchers to him. But there is no evidence of anything of the kind."

At any rate, I have come to the conclusion, that when a party projects and publicly promulgates the scheme of a joint stock company; when he causes the usual books to be opened, and allows or causes the inscription of a person as an owner of an interest to a definite amount and value therein, which is false within his own knowledge; when he embodies such false statements in a certificate of this right directly issued, and of the same effect as if signed by himself; when he accompanies that certificate by a written power, authorizing a transfer at large by the party to whom he has given the certificate; when that representation induces an innocent person to advance his money, the defendant's own individual act has created the priv-

ity of contract which the cases referred to appear to demand, and he must be held responsible to any one who has been deceived.

The representation was publicly addressed by the defendants to all; was intended to influence all who should become apprised of it; did exercise an influence upon the plaintiff, one of the mass addressed; that influence has resulted in his damage, and the fact embodied in the representation must be treated for the present as untrue, and as meant to deceive.

We all agree that the order should be affirmed with costs.

## SUPREME COURT.