# CHARLESTON

## COX v. NATIONAL COAL & OIL INVESTMENT COMPANY.

Submitted January 10, 1907.     Decided February 12, 1907.

1. EQUITY—*Pleading—Amendment of Bill.*
    While an amended bill cannot be allowed containing allegations inconsistent with the nature and purpose of the original bill or changing the cause of suit, yet, by its allegations it may be changed or modified and others added, provided the identity of the cause of suit be preserved. (p. 304.)

2. SAME—*Demurrer.*
    Where fraud is sufficiently alleged with proper parties to a bill demurrer will not lie. (p. 305.)

3. CORPORATIONS—"*Promoters.*"

A "promoter" is a person who brings about the incorporation and organization of a corporation, who brings together the persons who became interested in the enterprise, aids in procuring subscriptions and sets in motion the machinery which leads to the formation of the corporation itself. (p. 305.)

4. SAME.

A person is a promoter who holds in his own name and right, options on certain coal in place and organizes a corporation for the ostensible purpose of developing, mining, shipping and marketing the coal, the stockholders and directors of which corporation hold merely "qualification stock," and the holder of the options selling the same to the corporation. (p. 305.)

5. SAME—*Prospectus.*

When in purchasing said options from the promoter the corporation agrees to and does set apart to him in consideration thereof 100,000 shares of the capital stock of said corporation of the par value of one dollar per share authorizing him to sell the same at less than par and agrees to pay him in addition thereto $5000 in cash, making no provision for selling any of the treasury stock for less than par, and authorizing the promoter to issue a prospectus and other advertising matter to exploit the company to the public to induce purchasers to buy the capital stock of the company. *Held:* Such advertising was for the purpose of aiding in the sale of the stock of the promoter, so set apart to him. (p. 307.)

6. SAME—*Subscriptions to Stock—Fraud.*

A prospectus containing material statements concerning the condition of the corporation which are false, concocted by the promoter and directors of the corporation for the purpose of deceiving the public generally as to its condition, with the view of inducing the public to purchase its shares, will, if seen, believed, and acted upon by any member of the public, afford ground for avoiding his contract of subscription. (p. 307.)

7. SAME—*Cancellation of Subscription.*

When sales are made of such stock so advertised and the promoter being in charge of the stock book of the corporation and issues the certificates of stock directly in the name of the purchaser, and, in some instances, signing the name of the president of the corporation thereto, such action is fraudulent and coupled with such false statements to induce the purchase entitles the purchaser of such stock to a cancellation of his subscription. (p. 307.)

8. SAME.

When a prospectus of such character has been issued, no other relation or privity between the parties need be shown, except that created by the wrongful and fraudulent act of the defendants in issuing and circulating the prospectus, and the resulting injury to the plaintiff. (p. 308.)

9.  Same—*Personal Liability of Officers.*

Where a fraud is committed in the name of a corporation by persons having the right to speak for it, for their personal benefit, they will be made to answer personally for the injury inflicted by the fraud.  (p. 308.)

10.  Same—*Laches—Election.*

Where a purchaser of such stock, on discovering the false representations which induced him to subscribe, demands a rescission of his subscription and the return of his money, is induced by the promoter to wait until he can sell the options, which he represented that he could and would do in a short time, when his money and more would be returned to him, and where the rights of creditors or third parties have not intervened, and the purchaser brings his suit within six or twelve months to rescind, the promoter will be estopped from saying that "Knowledge of the fraud puts the party defrauded to his election" and by not taking action promptly on the discovery of the fraud he had lost his remedy.  (p. 312.)

11.  Same—*Pleading.*

It is not necessary in order to maintain a suit for restitution of money paid for stock purchased through false and fraudulent representations, to show that the defendant was in any way benefited by the making of such representation.  (p. 312.)

12.  Same—*Rescission of Contract.*

A court of equity has jurisdiction to afford relief to one who has been induced, through false and fraudulent representations of the promoters and officers of a corporation, to become a subscriber to its stock and may rescind the contract though fully executed and compel restitution.  (p. 313.)

13.  Appeal—*Review—Presumptions.*

The presumptions are all in favor of the correctness of a decree of the lower court, and the same will not be reversed on appeal unless error affirmatively appears upon the face of the record.  (p. 314.)

Appeal from Circuit Court, Ohio County.

Bill by Joseph A. Cox against the National Coal & Oil Investment Company and others.  Decree for plaintiff, and W. P. Robinson and certain other defendants appeal.

*Affirmed.*

G. B. Caldwell and W. P. Robinson, for appellants.

Frank A. McMahon, for appellee.

McWhorter, Judge:

Joseph A. Cox filed in the circuit court of Ohio county

his bill in equity against the National Coal and Oil Investment Company, a corporation, Wm. P. Robinson, John G. Crawford, Allen H. Robinson, C. S. Dalzell, R. J. Robinson Robert H. Hess and S. L. S. Spragg praying for a rescission of plaintiff's subscription to the stock of the said National Coal and Oil Investment Company and for a decree against the defendants and each and all of them for the sum of $1,000 with interest, being the amount paid by the said plaintiff for the stock, and for general relief. The bill alleges that the plaintiff was induced to subscribe for said stock by false and fraudulent representations on the part of the defendant Wm. P. Robinson, who was the promoter and organizer of the said corporation and of the said defendant Spragg who sold the stock to plaintiff; that the certificate of incorporation to said company was issued on the 3rd day of June, 1901, and filed for record on the 8th day of August, 1901; that the amount of capital stock subscribed for by the incorporators was 500 shares at $1.00 per share and $200 paid in and the capital stock authorized to be increased to $5,000,000.00, the shares of stock were to be of the face value of $1.00 each; that defendants John G. Crawford, Allen H. Robinson, together with R. E. Crawford and Fred W. Brown, were the incorporators; that on the 6th day of June, 1901, a meeting of the stockholders was held at which meeting a contract was entered into between the corporation and the defendant Wm. P. Robinson, whereby said Robinson transferred to the corporation certain options to buy coal lands which Robinson had theretofore secured from the owners of said lands and agreed to transfer to said corporation certain other options which he then had or might afterwards acquire, in consideration of which agreement said corporation allotted and set apart 100,000 shares of its stock to said Robinson and agreed and directed that stock certificates for the same were to be issued to whomsoever the said Robinson might direct, and agreed to pay him $5,000 in cash in addition thereto; that said Wm. P. Robinson was employed and directed by said corporation to prepare a prospectus for it, to advertise and exploit it to the general public for the purpose of selling its stock and more particularly for the purpose of inducing plaintiff and others of the general public to purchase and deal in said shares of stocks so allotted and set apart to said Wm.

P. Robinson; that Robinson prepared a prospectus for said corporation and on the 21st of September, 1901, the same was submitted by him to the board of directors who accepted the prospectus and authorized said Robinson to have as many copies printed of such advertising matter as he might deem necessary to exploit said corporation; that pursuant to said authority said Robinson published such prospectus and other literature, copies of which were filed with the bill as exhibits; that under the promises and representations contained in said prospectus, pictures, maps, hand bills, and believing and relying upon them plaintiff subscribed on the 5th day of August, 1901, for 1500 shares of stock at .20 per share paying therefor $300, and on the 31st of August, 1901, 3500 shares of stock at .20 per share, paying therefor $700, making a total of $1000 paid for stock; that said Spragg induced plaintiff to purchase said shares of stock by means of said prospectus and handbills and of the promises, assurances, pictures, maps, and representations contained therein, all of which said Spragg was authorized and empowered to do by all of the other defendants to the bill and in pursuance of said subscriptions and purchase the authorized officers and agents of said corporation entered plaintiff's name upon its books as a stockholder therein and issued to him certificates of the shares of stock so purchased by him; that plaintiff at the time of the purchase and payment for said stock and the issuing of the said certificates and for a long time thereafter believed that said stock so purchased by him was the treasury stock of the corporation held and owned by it and that his money would go and did go into the treasury of the corporation to be used in carrying on its business as described in the prospectus and handbills, when in truth and in fact the shares of stock so sold to him were a part of said 100,000 shares allotted and set apart for Wm. P. Robinson and the money paid therefor never went and was never intended by any of the defendants to the bill to go into the treasury of said corporation, but went into the pockets of defendants Spragg and Robinson all of which all the defendants to the bill well knew and consented to and of all which they intentionally and fraudulently kept plaintiff in ignorance.

At the November term, 1903, of said court, the defendants,

The National Coal and Oil Investment Company, Wm. P. Robinson, John G. Crawford, Allen H. Robinson, R. J. Robinson and Robert H. Hess and each of them filed their demurrers to the plaintiff's bill, all of which demurrers were overruled by the court and the defendants were given thirty days from the date of the overruling of the demurrers— 19th of December, 1903—to file their answers. On the 18th day of January, 1904, all the defendants (except C. S. Dalzell) filed their respective separate answers to plaintiff's bill and on the "16th of February, 1904, came all the parties, plaintiff and defendants by their attorneys, except C. L. Dalzell, and the plaintiff by his attorney moved for leave of court to file his amended bill of complaint herein and tendered said amended bill for filing, and thereupon because the amendments therein are improper to be allowed to a sworn bill, the defendants, except said Dalzell, objected to the filing thereof," the objections were overruled, the amended bill filed and the cause was remanded to rules to be matured for hearing on said amended bill and answers, if any should be filed thereto. The amended bill recites the filing of the original bill and its prayer for the rescission of plaintiff's subscriptions to the stock of the defendant company, and for a decree against the defendants for the money paid by him for the stock; reiterates the allegations of the bill touching the incorporation and organization of the company, that Wm. P. Robinson was its promoter and organizer; that at a stockholders meeting held on June 6th, they made the contract with W. P. Robinson for the transfer of certain options on coal lands held by him to the corporation and the allotment and setting aside of 100,000 shares of the capital stock to said Robinson and to pay in cash an additional sum of $5,000 to Robinson for said options; that said W. P. Robinson was at said meeting employed and empowered to prepare a prospectus for said corporation to advertise and exploit it to the general public for the purpose of selling its stock and more particularly for the purpose of inducing plaintiff and others of the general public to purchase and deal in said shares of stock so allotted and set apart to said Robinson; that said Robinson prepared a prospectus for said corporation and afterwards, to-wit, on the 21st of September, 1901, the same was submitted by him to

the board of directors of said corporation at a meeting of said board which was composed of defendants John G. Crawford, Allen H. Robinson, R. J. Robinson, C. S. Dalzell and Robert H. Hess, which board thereupon accepted said prospectus and authorized said W. P. Robinson to have the same printed, together with such other advertising matter as he might deem necessary to advertise and exploit said corporation; that in pursuance of said authorization said Robinson had said printing done, copies of which prospectus and handbills were filed with the bill. It is alleged that "By reference to said Exhibits A, B and C, Your Honor will observe, among other statements, that the following promises, assurances and representations of material existing facts, past acts &c were therein made unequivocally in order to induce your orator and others to purchase shares of stock in said corporation, and particularly said shares of stock so set apart and allotted to said William P. Robinson, viz:

a. This company offers to the careful investor a chance wherein he may place his money so that by any system of figuring, including all accidents, it is bound to return to him three fold.

b. Capital stock of $5,000,000. 5,000,000 shares, par value, $1.00 per share. 3,000,000 shares for development purposes.

c. The National Title & Trust Company, Wheeling, West Va., Examiner of Titles and Fiscal Agents.

d. The National Coal and Oil Investment Company has 10,000 acres of the best coal lands in West Virginia, containing the celebrated Pittsburg and Mapletown veins, yielding about 20,000 commercial tons or 510,000 bushels per acre. The value of this coal acreage mined and put upon the market is about $200,000,000. Part of the above tract, which is a part of the celebrated Sisterville oil field, has been leased for oil by this company. The proceeds of all oil will be applied as dividends on the capital stock without a cent of cost to the shareholders. The stock of this company affords the best opportunity ever offered to participate in the immense fortunes now being made in Coal and Oil.

e. That the value of the properties is as represented and

that a reliable and profitable investment has been provided.

f. That every share of stock is backed by solid values in coal.

g. That our coal land is situated on nature's highway, the Ohio River and the Ohio River Railroad, at Proctor, W. Va., 30 miles below Wheeling, W. Va., and 130 miles below Pittsburg, Pa., thus rendering the building of costly railroads to our property unnecessary, and giving us the advantage over all companies in shipping to the South and West, and controlling the trade of those sections of this country. (See map on inside cover of this prospectus.)

h. That arrangements are being made for an equipment of the latest electrical mining outfits.

i. Every share of stock issued by this company is backed ten fold by soldid values in coal, thereby insuring to all a sure and reliable investment.

j. Big dividends will shortly be paid.

k. We have the best lands in the best districts.

l. There are 1556 tons per foot in each acre of coal.

m. Our holdings are located in Marshall and Wetzel counties, West Virginia.

n. This Company has 16 feet or 24,896 tons of coal (worth $1.20 per ton-mined) in each acre. Each acre contains over 500,000 bushels of coal. Ascertain the price of coal in your home market and figure out the values for yourself. "You can read your title clear" to large profits. The wholesale value of our coal placed upon the market is over $200,000,-000. Retail value over $400,000,000. Each share of stock can advance to $80, before the value of the coal is reached. Additional acres will be secured and stock values advanced accordingly.

o. This stock will soon be selling in the open market at four and five dollars per share and will probably go much higher.

p. That competent lawyers have examined the holdings of the Company.

q. That J. M. Nichols, one of the largest oil operators in West Virginia, member of the Associated Producers Company, president and director in various banks and

other enterprises, has drilled many oil wells through our
property, and in each and every instance he found the coal
as represented.

Your attention is directed to the important fact that this
Company is in no sense a prospect or an uncertainty. It has
gone beyond the experimental stages.    10,000 acres of the
best coal land in West Virginia have been secured, contain-
ing the celebrated Pittsburg Vein,—16 feet of solid coal in
each acre.    It is but reasonable to presume that, within a
short time, the income and profits will be enormous;" that
by means of the pictures in said prospectus and particularly
by the picture of a coal tipple in operation and labelled with
the sign "National Coal and Oil Investment Company" said
prospectus represented that said corporation was actually
engaged in the business of mining and delivering coal for
shipment; that plaintiff believing and relying upon such
promises and representations and having every confidence
in their truth and sincerity in fact and that he was invest-
ing his money in the stock of a corporation which owned
property such as was described in said paper and being in
ignorance that said shares had been set apart to Robinson for
the options on coal land or that the corporation had agreed
to pay said Robinson any money for said options or that
any promoter's fund had been paid out or promised, pur-
chased the said stock from said defendant Spragg in August
1901; alleging that said Spragg verbally made to plaintiff in
effect the same statements as contained in said advertising
matter and emphatically assured plaintiff that said shares of
stock were the treasury stock of said corporation owned and
controlled by it and that he was the mere agent of said cor-
poration to sell its treasury stock, receiving therefor a small
commission; and charged that the whole scheme of said cor-
poration from its very foundation was intended to defraud
the public into purchasing said shares of stock so set apart to
W. P. Robinson; that it was never the intention of said Rob-
inson and the defendant directors to carry out the promises
and assurances held out by them in the printed matter and
by their agents and representatives; and that it was the de-
sign of said Robinson and said defendant directors at all
times to keep the purchaser of said shares of stock in igno-
rance of the fact that said stock had been set aside for Wm.

P. Robinson; alleging that not only did the said corporation never own a foot of coal land but further that it never had money enough with which to buy the fractional part of the coal land named in the options transferred to it by the defendant Wm. P. Robinson; "Your orator charges that said corporation was organized; that said 100,000 shares of stock were set apart for Wm. P. Robinson; that said gross misrepresentation of material facts were made by the defendant corporation, its said directors and the said William P. Robinson for the express purpose of swindling and fraudulently to lure and entrap your orator and others into purchasing the shares of stock set apart for the defendant William P. Robinson, as above described. And the use of said gross misrepresentations of material facts by the defendant S. L. S. Spragg was either intentionally fraudulent, or so grossly careless of the truth or falsity of them, as amounts in law to knowledge of their false and fraudulent character, and makes him, along with the other defendants, liable for the consequent detriment to your orator, since to your orator the result is the same, whether caused by actual or constructive fraud;" and prayed for a rescission of said subscriptions by plaintiff to said stock and declaring the same null and void, and for a decree against the defendants for the money paid; and averring that he was willing to do equity and would assign and surrender the said stock to whomsoever the said court might direct as soon as he was made whole as asked in his said bill.

The defendants (except Dalzell) filed their demurrers to said amended bill which demurrers on the 3rd of June, 1904, were overruled, and the defendants required to answer on or before August 1st. The defendants The National Coal and Oil Investment Company, Wm. P. Robinson, John G. Crawford, Allan H. Robinson, R. J. Robinson and Robert Hess, filed their joint and several answers and defendant S. L. S. Spragg filed his separate answer to the amended bill to which several answers the plaintiff filed his general replication. The defendants in their answers admit the incorporation and organization of the company as alleged and the purchase from the defendant Robinson of the options and the preparation and publication of the prospectus and other advertising matter, but denied that it was used for the purpose

of inducing the plaintiff and the general public to purchase and deal in the stock set apart to Robinson, but averred that it was to induce the general public to invest in the stock of the company by subscribing and paying for the same at its par value of $1 per share and not less, and it was never contemplated to be used for the purpose of selling stock for W. P. Robinson or any other person; that the exhibits filed with the bill as A, B and C were true copies of the advertisements but denied that they were published for the purposes alleged in the bill but that they were prepared with a view to the future, and aimed to set forth the prospects and hopes of the company, what it hoped to accomplish in the future; denied that plaintiff relied upon said promises, assurances and representations in purchasing the stock; they admitted that plaintiff was in utter ignorance of any falsity in said representations and assurances contained in said exhibits, as they were not in existence at the time of his purchases on August 5th and 31st, 1901; that it was not true that Spragg was authorized to make such representations and promises as were alleged in the bill. The defendants deny, upon information and belief, that the representations made in said exhibits A, B and C were absolutely false and fraudulent, but they fail to allege or aver that they were true. They say to the best of their knowledge and information and belief that it was not true that the represenations that the defendant corporation had coal lands on the Ohio River and Ohio River Railroad at Proctor, was absolutely false and fraudulent but admitted that it was true that said corporation did not own the land in fee simple but that on the payment of $15 per acre the corporation would be entitled to a deed in fee for all the coal underlying the land described in the options owned by the corporation and that it was also true that the said coal was worth many thousand dollars in excess of the price which the corporation could have purchased the same for by virtue of said options; and averring that upon information and belief, until a short time before this suit was instituted, plaintiff was making his sole claim against the defendant Spragg, that he did not include the other defendants therein and did not claim that he had been defrauded by any of the other defendants; denied that any part of the $1,000 paid to Spragg for the stock was paid to any of the other defendants by

plaintiff or by Spragg and that Spragg was not the agent of any of the defendants on or before the 5th day of August, or the 31st day of August, 1901, or at any other time as to any matter relating to the stock of said company, or that Spragg was ever authorized as an agent or otherwise by any of respondents to make any promises, assurances or representations of any kind or character whatever on or before the 5th or 31st of August, or at any other time; that if said Spragg was an agent for said company its directors, officers, agents and employees had no authority to sell stock at less than the par value; that if plaintiff did actually purchase 5000 shares of stock from the said company or any of its agents for $1000, in that event there remained due to the company $4,000 the difference between the price paid and the par value; and the National Coal and Oil Investment Company prayed that if the proof should show that the plaintiff purchased stock from the company through Spragg as its agent, as alleged, then that this answer might be taken on its behalf as a cross-bill and a decree rendered for it for $4,000 against the plaintiff.

Said Spragg denied in his answer that he induced the plaintiff to purchase the shares of stock by means of said prospectus and handbills and of the promises, assurances, pictures, maps and representations contained therein; that plaintiff asked respondent what he thought of the investment and he told plaintiff he thought it was good; that he told plaintiff he could sell him stock at .20 per share, the then selling price, and he bought from the respondent 1500 shares and paid him $300 and afterwards paid respondent $700 for 3500 other shares, respondent giving plaintiff a written guaranty that the same would be advanced to .30 a share by the company; that respondent had purchased from defendant Wm. P. Robinson 20,000 shares of the treasury stock and for a long time afterwards until the 31st day of March, 1903, and long after the plaintiff had purchased his stock respondent believed that the stock purchased by him was the treasury stock of said company and owned and held by it and that the money respondent paid to Wm. P. Robinson for the said stock would go and did go into the treasury of said corporation to be used in carrying on the business of said corporation, when in truth and in fact the said 20,000

shares were a part of the 100,000 shares theretofore alotted to Robinson and the money paid for said shares by respondent never went and never was intended to go into the treasury of the company, but it·went into the pocket of Robinson; denied that he took advantage of plaintiff or defrauded him out of the $1,000 as alleged in the bill; that at the time he purchased his own stock and at the times he sold to the plaintiff the stock respondent did not know there was any promoter's stock, whether legal or illegal; that respondent had full faith in the company, its officers and·in Wm. P. Robinson its promoter at the time plaintiff purchased stock from respondent and for a long time afterwards, and denied all unlawful combination and confederacy as charged against him.

Many depositions were taken and filed in the case and on the 25th day of May, 1905, the cause was submitted and the court took the case under advisement, and on the 14th day of September, 1905, "the court having fully considered this cause, and the court being of the opinion that the clear preponderance of the evidence is in favor of the claim asserted in said original bills, and against the said defendants, and the allegations contained in said answers, and the court being of the opinion that the plaintiff is entitled to a decree herein rescinding and cancelling his subscriptions for stock in The National Coal and Oil Investment Company, a corporation, as prayed for in the said original and amended bills, and the court being further of the opinion that the said plaintiff is entitled to recover in this cause as damages, the sum of $300.00, being the amount paid by him, upon his first subscription for such stock, with interest to this date, and the further sum of $700.00 being the amount paid by him for his second subscription to such stock, with interest to this date of and from the said defendants, William·P. Robinson, Allan H. Robinson, John G. Crawford, R. J. Robinson and S. L. S. Spragg. It is further ordered, adjudged and decreed that the subscription of the plaintiff, Joseph A. Cox, for 1500 shares of the stock of The National Coal and Oil Investment Company, a corporation, made on the 5th day of August, 1901, and the subscription made by him for 3500 shares of said stock on the 31st day of August, 1901, be and the same hereby are rescinded and cancelled, and it is further

ordered, adjudged and decreed that the said plaintiff, Joseph A. Cox, do recover of and from the defendants, William P. Robinson, John G. Crawford, Allan H. Robinson, R. J. Robinson and S. L. S. Spragg, the sum of $300.00 with interest at the rate of 6 per cent per annum from the 5th day of August, 1901, to this date and the further sum of $700.00 with interest at the rate of 6 per cent per annum from the 31st day of August, 1901, to this date, that is to say, the sum of $1243.30 with interest from this date until paid, and the costs by him about his prosecution in this behalf expended." From which decree the defendants William P. Robinson, John G. Crawford, Allan H. Robinson and R. J. Robinson appealed.

It is contended that the court erred in permitting the amended bill to be filed over the objections of the defendants. Section 12, chapter 125, Code (section 3832, Code 1906) is very liberal in the way of amendments to declarations or bills, leaving it largely in the discretion of the court as to the terms upon which an amendment may be made as to a continuance of the cause and the payment of costs of such continuance. The amendments made in case at bar are no departure from the purpose of the original bill and tend to promote a fair hearing of the matters in controversy on which the original bill was based. The amended bill introduced no new substantive cause of suit different from that stated and different from that intended to be stated in the original bill. While an amended bill cannot be allowed containing statements inconsistent with the nature of the original bill or changing the cause of suit, yet, by its allegations it may be changed or modified and others added, provided the identity of the cause of suit be preserved. See *Bird* v. *Stout*, 40 W. Va. 43, Syl. pt. 4; *Lamb* v. *Cecil*, 28 W. Va. 653, Syl. pt. 1. In case at bar the cause of suit in the amended bill is strictly preserved, the only change made by the amended bill which differs from the allegations of the original bill is the use of the *videlicit* before the dates given of the purchases of the stock by plaintiff and that of the publication of the prospectus and other advertising matter, exploiting to the public the corporation, its holdings, promises, purposes and representations; and more explicitly alleging the verbal representations, &c. made by the defendant Spragg than was done in the original

bill. The general scope and purpose of the suit was in no wise changed. The suit was brought to annul and cancel plaintiff's subscriptions to the capital stock of the company for gross fraud and false and fraudulent representations on the part of the defendants to induce plaintiff to make such subscriptions and the allegations of the amended bill are strictly confined to that purpose. As to the demurrer to the bills, as held in *Chrislip* v. *Teter*, 43 W. Va. 356, (27 S. E. 288): "When fraud is sufficiently alleged, with proper parties to a bill, a demurrer will not lie." See also *Wheeling Ice and Storage Company* v. *Conner*, (W. Va.) 55 S. E. 982. The demurrers were properly overruled.

As said by the trial judge, it may be noted that many and, indeed, most of the facts set out in the bill are not denied in the answer. Some of the conclusions drawn by the bill from the facts alleged are denied, but the facts are either admitted or not denied. The answer denied that W. P. Robinson was the promoter of the company, but the evidence shows that the options were taken in his name through an agent employed by him, the corporation was organized by him for the purpose of taking these options from him. This seems from the record to be the only purpose of the company and after its organization it became an agency for the sale and distribution of his stock. The only business the company ever did was to purchase the options from Robinson and set aside 100,000 shares of its stock to him; agree to pay him in addition to the stock $5,000 in cash; advertise the stock; issue certificates to persons who purchased from him and employed him to prepare and have printed advertising matter and thus became indebted to him. 2 Cook on Corporations, section 651, in defining a promoter, says: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions and sets in motion the machinery which leads to the formation of the corporation itself." Citing *Burbank* v. *Dennis*, 101 Cal. 90. A very fair description of the "promoter" who undertakes the enterprise, not for the benefit of the corporation to be organized, but for what he can make out of it for his own benefit, is found in *McMullen* v. *Richie*, 64 Fed. Rep. 253, 260. In section 545, 1 Morowetz on Priv.

Cor., it is said: "As a rule, the promoters possess absolute control over the policy and operations of the company when it is first formed, and in many instances the first board of directors of the company consists of nominees of the promoters, and is wholly within their control. The subscriptions of the shareholders are made upon the trust that the promoters are men of rectitude and business sagacity, who will use their knowledge and exercise their control over the enterprise, for the benefit of the company." The fact of W. P. Robinson being the promoter and organizer of the company is not left in doubt by the evidence and the circumstances of the case. It is emphatically denied in the answer that the prospectus or any of the advertising matter mentioned in the bill and set out in exhibits A, B and C was published or promulgated before September 21, 1901, but the defendant W. P. Robinson on cross-examination as a witness, in speaking of exhibit B, says: "It must have been printed between June 7th and June 21st, 1901," and that the answer should have only referred to exhibits A and C, which he claims were not in existence, as stated in the answer. The defendants in their answer "upon information and belief" denied that the representations were false or fraudulent, but did not say they were true. They deny that the representations were intended to deceive the plaintiff and others or induce them to purchase stock of the corporation, but that they were "used with the purpose of showing the probabilities and what it hoped to accomplish in the future." Among the representations contained in Exhibit B, which is proven and admitted to have been in existence before and at the time the plaintiff purchased his stock, were the statements that the National Coal and Oil Investment Company had 10,000 acres of the best coal lands in West Virginia containing the celebrated Pittsburg and Mapletown veins; that, part of the said 10,000 acres which was a part of the celebrated Sistersville oil field had been leased for oil by the said National Coal and Oil Investment Company; that the proceeds of all oil produced would be applied as dividends on the stock without a cent of cost to the shareholders; that the values of the property were as represented and that a reliable and profitable investment had been provided; "that every share of stock issued is backed by solid values in coal;" that arrangements were be-

ing made for an equipment of the latest electricel coal mining outfit; that the stock was fully paid, non-assessable and carried no personal liability; and "that the directors of the National Coal and Oil Investment Company will redeem, if desired, all stock purchased of them at the full face value within one year from July 1, 1901." These were stated as facts then existing and it is not even claimed in the answer or otherwise that such facts were true and it is hard to conceive how they could be "used with the purpose of showing the probabilities and what it hoped to accomplish in the future." Being facts thus stated in positive unmistakable language and no such facts existing in truth, and being relied upon by a purchaser of the stock were fraudulent. The corporation was wholly without property except the options assigned to it by Robinson which were of no value whatever, save the right to purchase the coal mentioned in the options at the price named in cash; it owned no coal; had made no lease for oil; had no funds with which to purchase the coal upon which it had the options; was taking no steps to procure funds for the purchase of said coal; had made no provision for the sale of any of the treasury stock of said company at less than par, as they might do under the provisions of section 24, chapter 53, section 2253, Code 1906, and the sale of stock was the only method they could adopt for raising funds. When they had provided for the sale of the 100,000 shares set apart to Robinson, they knew it was impossible and they could not hope to sell any of their treasury stock at par while the 100,000 shares of Robinson were on the market at from ten to thirty cents per share, and all the advertising for the sale of stock could only apply to that stock set apart to Robinson and it was the only stock offered for sale. It is clear that the whole object of exploiting the company by the advertising authorized by the corporation and done by Robinson was for the sole purpose of selling the stock so set apart to him. Not a dollar of the proceeds of the sale of stock was for the benefit of the company to enable it to provide "an equipment of the latest electrical mining outfit" for the active operations of the corporation, so speciously portrayed in their advertising matter. In *Morgan* v. *Skiddy*, 62 N. Y. 319, 326, the court, in speaking of a prospectus containing false statements of material facts, says:   "When a pros-

pectus of this character has been issued no other relation or privity between the parties need be shown, except that created by the wrongful and fraudulent act of the defendants, in issuing or circulating the prospectus and the resulting injury to the plaintiff." Citing *Clark* v. *Dixon*, 6 C. B. (N. S.) 453; *Central Railroad Co.* v. *Kish*, Law Rep. (2 Eng. and Irish App.) 100. See also *Chester* v. *Dickerson*, 52 Barb. (N. Y.) 349; *Shotwell* v. *Mali*, 38 Barb. (N. Y.) 445. And in *Vreeland* v. *Stone Co.*, 29 N. J. Eq. 188, it is held: "1. A contract of subscription to the stock of a corporation if procured by fraud will be set aside. 2. The universal rule, whatever fraud creates, justice will destroy. 5. Where a fraud is committed in the name of a corporation by persons having the right to speak for it, for their personal benefit, they will be made to answer personally for the injury inflicted by their fraud." *Cazeaux* v. *Mali*, 25 Barb. (N. Y.) 578; *McClanahan* v. *Land Co.*, 96 Va. 124; *Martin* v. *Land Co.*, 94 Va. 28; *Bosher* v. *Land Co.*, 89 Va. 455; 14 A. & E. E. L. 151. In 10 Cyc. 429: "A fraudulent prospectus or report concocted by the directors of a company for the purpose of deceiving the public generally as to its condition, with the view of inducing the public to purchase its shares, will, if seen, believed, and acted upon by any member of the public, afford ground for avoiding his contract of subscription." Citing *Cross* v. *Sackett*, 2 Bosw. (N. Y.) 617; *Ayre's Case*, 25 Beav. 513, 4 Jur. N. Y. 504, 27 L. J. Ch. 579; 10 Cyc. 845, 846. In a note to *Cottrill* v. *Krum*, 100 Mo. 397, 18 Am. St. 549, at page 562, it is said: "The directors of a company are liable to an action for damages for false statements contained in prospectuses issued by them, where they knew or ought to have known their falsity, and the plaintiff, relying on such statements, has acted upon them to his hurt. *Peck* v. *Derry*, 59 L. T., N. S., 78; *Terwilliger* v. *Great Western Tel. Co.*, 59 Ill. 249; *Booth* v. *Wonderly*, 36 N. J. L. 250; *Morgan* v. *Skiddy*, 62 N. Y. 319; *Cross* v. *Sackett*, 6 Abb. Pr. 247; *Fenn* v. *Curtis*, 23 Hun. 384; *Paddock* v. *Fletcher*, 42 Vt. 389." If a purchaser of stock in a corporation made his purchase relying upon material statements in corporate reports which were false, he has his remedy against all persons who knowingly made or issued the report. 2 Cook on Corporations, section 352, and authorities there cited.

On the 10th of September, 1901, W. P. Robinson and A.. H. Robinson, acting for themselves and for J. G. Crawford, R. E. Crawford and R. J. Robinson, entered into a contract with Fred W. Brown, a copy of which is exhibited with the deposition of Brown, whereby the said parties agreed to have delivered to said Brown 400,000 shares of the National Coal and Oil Investment Company, 100,000 shares at .10 per share; 100,000 at .15 per share; 100,000 at .20 per share; 50,000 at .25 per share and 50,000 at .30 per share, "which stock is to be issued from the stock which was set aside for W. P. Robinson on the 6th day of June, 1901." In consideration of which the said Brown "conveyed all his right, title and interest in certain coal lands situated in Marshall and Wetzel counties, West Virginia, to the National Coal and Oil Investment Company for certain shares of capital stock of said company and for the further consideration that the said company pay to the owners of said coal lands the balance due on said coal lands in cash." When it is remembered that only 100,000 shares of stock were set apart to W. P. Robinson in June, 1901, it becomes difficult to explain the action of these parties in entering into a contract to sell to Brown 400,000 shares out of the said 100,000 shares when it must be remembered also that the corporation had authorized only the 100,000 shares to be sold under the par value. As aptly said by the court below: "With such methods no money could ever come into the treasury of the company even if half a million shares of stock were sold. But as if to make it absolutely sure that no money could be used for the purpose of the company, it appears from the evidence of W. P. Robinson, that he, assuming the name of the National Title and Trust Company, was to put all money actually paid to the company for stock sold at par on deposit in bank and hold it to meet the guaranty of the directors, under which they were to redeem such stock within one year after date, at its face value.

It is clear to me that the officers and directors of the company who were in charge of its affairs, never intended to purchase coal or to make any effort to provide for the stockholders anything that would represent the value of their stock.

The representations which have been noticed were false

and known to be false, but in addition thereto the officers of the company pursued a course that made it impossible for the company's stock ever to become valuable."

It is abundantly proved that W. P. Robinson besides issuing the flaming prospecuus and other literature exploiting the company, personally represented to various parties that the National Coal and Oil Investment Company was the owner of 10,000 acres of coal land. Robinson also had charge of the stock books and issued certificates of stock, in some instances signing the name of John G. Crawford, president, to the certificates so issued by him. The stock set apart to W. P. Robinson was not issued to him, but when sold by the agents was issued directly to and in the name of the purchaser of stock, thus making it appear that the purchaser was receiving the treasury stock of the corporation, when in fact and in truth it was the stock set apart to W. P. Robinson, and no part of the proceeds went into the treasury of the corporation.

It is insisted by defendants that the contract for the purchase of the stock by plaintiff, if fraudulent, was not void but voidable only and that upon the discovery of the fraud it was the duty of the plaintiff to repudiate promptly the contract and to ask for a rescission, but that by his delay as well as by taking part in a meeting of the stockholders March 31, 1903, he elected to affirm the contract, and that not having elected promptly to rescind, and having committed acts affirming the contract, that he will not now be permitted to disaffirm. It appears from the testimony of the plaintiff that he, at the end of the year from the date of his subscription, demanded the return of his money according to the representations contained in the company's published advertisement to redeem the stock; and that he first learned on a visit to the office on the 13th of September, 1902, or in the spring of 1903, that the company owned no coal, but had nothing but bare options to purchase coal. He then and there again demanded the return of his money, which being denied him he threatened to bring a suit when Robinson said to him, "You bring suit against the company and we will make you pay the other .80 on the dollar." Plaintiff was asked to wait until the options could be sold, which he was assured could be done at a profit. On cross-

examination plaintiff was asked this question: "Is it not a fact that on that occasion, to-wit, September 13th, 1902, you said you would wait and see if the company was able to make a sale of the said options and that if you did not come out whole you would hold S. L. S. Spragg responsible for any loss you might sustain? A. The answer to the first part is yes. I told Mr. Robinson that so far as I was concerned I was willing to wait for the profitable sale which he suggested. The answer to the second part is no, as W. P. Robinson himself cannot fail to see. I simply threatened to bring suit without specifying anyone in particular, to which Mr. Robinson replied, and which I feel confident he will not deny, 'You bring suit against the company, and we will make you pay the other eighty cents on the dollar.' This reply was given angrily and as well as I remember, terminated somewhat abruptly our conference."

It is true where a party has elected to affirm his contract, he cannot thereafter disaffirm. But in case at bar can it be said that plaintiff affirmed his contract of subscription when he demanded his money at the end of the year from the date of subscription and insisted upon it and threatened to bring suit and was induced by the further representations of Robinson that he could and would sell the options in a short time at a profit, when the plaintiff would have his money and more returned to him. He says he consented to wait for the profitable sale of the options suggested by Robinson. There was clearly a request on the part of Robinson to plaintiff to postpone any action in the way of enforcing plaintiff's rescission of the contract to give Robinson an opportunity to raise the money by the sale of the options. Plaintiff never agreed to desist from having his contract rescinded, but to postpone the matter for the accommodation of the defendants. Instead of this working an estoppel, the equitable operation of it would be to estop the defendants from asserting that the plaintiff was thereby estopped. The rights of no third parties had intervened, there were no creditors of the defendant corporation except Robinson himself, so it cannot be said that plaintiff's delay would work an injury to third parties or creditors of the corporation. I do not find any direct authority for the position, that under the circumstances the defendants would be estopped from pleading delay on the

part of the plaintiff in bringing his action, but it is perfectly in accord with the principles of equity and right and just dealing. The plaintiff did not for a moment agree to stand longer by the contract or to ratify the same, but only at the suggestion of the defendant Robinson said he was willing to wait to see what he could do with the options and thus relieve the defendants. The delay in any event was not a long delay, at most but a year and probably only six months. Defendants rely upon *Boyce* v. *Gas Coal Co.*, 37 W. Va. 73, where it is held that a stockholder who had notice or the means at hand of becoming acquainted with the contract made by his corporation, would not be allowed to remain quiet an unreasonable length of time with a view to ascertaining whether his contract would result in profit to him and then repudiate the contract if it had resulted in loss. That was a case in which the party had delayed nearly nine years before taking action. That case also refers to *Insurance Co.* v. *Railroad Co.*, 32 W. Va. 257, where it was held that acquiescence in a contract for six years was sufficient to work an estoppel. In case at bar plaintiff never did acquiesce in the contract after he learned of a material misrepresentation which had led him into the purchase of the stock, and only said to the defendants in effect, I will give you a reasonable time in which to sell the options and relieve yourselves from the necessity of returning the money to me from your own pockets. In *Cottrill* v. *Krum*, 100 Mo. 397, 18 Am. St. 549, it is held: "A plaintiff does not waive his right to sue for damages for false representations by offering, after the purchase of the property, to sell it at the price which the defendant represented to be its value, nor by allowing four or five months to elapse before bringing his suit."

It is insisted that neither W. P. Robinson nor the company having received any money paid for stock purchased by the plaintiff, they cannot be held liable therefor. In a note to *Cottrill* v. *Krum*, *supra*, 555, we find: "It is not necessary in order to maintain an action to recover damages for a false representation, to show that the defendant was in any way benefited by the making of such representation, or that he was in collusion with some one else who was benefited: *Pasley* v. *Freeman*, 3 Term Rep. 51; *Hart* v. *Tallmadge*, 2 Day 381; 2 Am. Dec. 105; *Endsley* v. *Johns*, 120

Ill. 479; 50 Am. Rep. 572; *Fisher* v. *Mellen*, 103 Mass. 503; *Patten* v. *Hurney*, 17 Mass. 182; 9 Am. Dec. 141; *New York L. 1. Co.* v. *Chapman*, 118 N. Y. 288; *Rice* v. *Manley*, 66 N. Y. 82; 23 Am. Rep. 30; *Hubbard* v. *Briggs*, 31 N. Y. 518; *White* v. *Merritt*, 7 N. Y. 352; 57 Am. Dec. 527; *Upton* v. *Vail*, 6 John. 181; 5 Am. Dec. 210."

It is claimed also that plaintiff cannot recover against Robinson and the other defendants, because he bought the stock relying upon the guaranty of Spragg, but the evidence shows clearly that he bought relying upon the representations made by Spragg and those contained in the publications made for the company by Robinson. The guaranty of Spragg, filed with the deposition of Cox, shows that he agreed to protect Cox against any loss on decline of stock and that when the stock had advanced to .30 per share said Cox was required to sell or else the guaranty to be null and void. This was a guaranty of an agent of the company and Robinson who was selling the stock and doubtless at the time he was confident of the truth of the representations made by the defendants and by himself at the time he sold the stock and gave the guaranty; and Cox says that when he gave him the guaranty Spragg said this would give him double security. It is not shown in the record that plaintiff relied upon the guaranty alone, and the guaranty does not show it.

Can plaintiff in a suit in equity recover damages for false representations made by a promoter and officers of a corporation? In 1st Cook on Corporations, section 156, in treating of the cancellation of subscriptions to the stock of corporations, made upon false representations and mis-statements, it is said: "A court of equity in these actions will give complete relief by decreeing that the directors guilty of the fraud shall refund to the subscriber payments made by him before discovering the fraud. This relief dispenses with an action at law for damages for deceit, and when sought for in the bill in equity the guilty directors must be made parties. The bill is not multifarious by reason of its containing prayers for these various kinds of relief."—and authorities there cited. *Bosher* v. *Land Co.*, 89 Va. 455; *Tyler* v. *Savage*, 143 U. S. 79. And in *Barcus* v. *Gates*, 89 Fed. Rep. 783, it is held: "A court of equity has jurisdiction to afford relief to one who has been induced, through the fraud of the promoters of a

corporation, to become a subscriber to its stock, and may rescind the contract, though fully executed, and compel restitution." *Carey* v. *Coffee Steaming Machine Co.*, (Va.) 20 S. E. 778; *Sherman* v. *Stove Co.*, 85 Mich. 169. At section 155, 1st Cook on Corporations, the author says, the bill in equity "is the fairest, safest and most complete remedy that the subscriber has. It is a decisive notice to the corporation and all third parties not to rely upon the subscription in question."

There is conflict in the evidence, and it has been many times held by this Court that "Where the decree sought to be reversed is based upon depositions, which are so conflicting and of such a doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proved by them, or the proper conclusion to be deduced therefrom, the appellate court will decline to reverse the finding or decree of the chancellor, although the testimony may be such that the appellate court might have pronounced a different decree, if it had acted upon the cause in the first instance."—*Smith* v. *Yoke*, 27 W. Va. 639. "A decree of a circuit court founded on conflicting and contradictory testimony will not be disturbed unless plainly erroneous."—*Yoke* v. *Shay*, 47 W. Va. 40. "An appellate court will not reverse the judgment of an inferior court unless error affirmatively appear upon the face of the record, and such error will not be presumed, all the presumption being in favor of the correctness of the judgment." *Shrewsbury* v. *Miller*, 10 W. Va. 115, Syl. point 2; *Richardson* v. *Donehoo*, 16 *Id.* 685, Syl. point 14; *Griffith* v. *Corrothers*, 42 *Id.* 59; *Springer* v. *Springer*, 47 *Id.* 38.

We find no error in the decree and the same must be affirmed.

*Affirmed.*