**Irving GORDON, Plaintiff-Appellant,**

v.

**Robert L. BURR and Elpac, Inc., Defendants-Appellees, and Arnold Lord and Philips, Appel & Walden, Inc. (sued herein as Philips, Appel & Walden), Defendants-Appellees-Appellants.**

**Nos. 179, 310 and 311, Dockets 74–1749, 74–1865 and 74–1840.**

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1974.

Decided Nov. 20, 1974.

John C. Klotz, New York City, (Leonard Loewinthan, New York City, of counsel), for plaintiff-appellant Gordon.

Michael C. Devine, New York City, (Butowsky, Schwenke & Devine, New York City), for defendant-appellee, cross-appellant Lord.

Steven H. Lipsitz, New York City, (Bressler, Meislin, Tauber & Lipsitz, Neil M. Berson, New York City, of counsel), for defendant-appellee, cross-appellant Philips, Appel & Walden, Inc.

Harry Balterman, New York City, for defendant-appellee Elpac, Inc.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

Irving Gordon, a purchaser of securities issued by Elpac, Inc., sued for rescission of his purchase and restitution of his $45,000 payment against: Robert L. Burr, as seller of the shares; Arnold Lord, as the salesman; Philips, Appel & Walden, Inc. (P.A.W.), as Lord's brokerage firm; and Elpac, Inc., as the issuer. After a non-jury trial, Judge Arnold Bauman of the Southern District of New York, in an opinion reported at 366 F.Supp. 156 (1973), accepted Gordon's claims that Burr and Lord had violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[1] by misrepresenting material facts in the transaction with Gordon and that P.A. W. had violated § 20(a) of the Act, 15 U.S.C. § 78t(a),[2] as a "controlling person" of a § 10(b) violator, Lord. The court rejected Gordon's attempt to implicate Elpac in the fraud as a controlling person of Burr, Elpac's president during most of the negotiations preceding Gordon's purchase and a director alone for the remainder of the period relating to the transaction. Judge Bauman granted the requested rescission relief against Burr but held that as a matter of law such relief was inapplicable to persons not in privity of contract with the defrauded purchaser. Thus, although he went on to find that Lord and P.A.W. had violated the securities laws, Judge Bauman deemed them

---

1. § 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary

or appropriate in the public interest or for the protection of investors.

2. § 78t. Liabilities of controlling persons

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

immune from a rescission remedy. He held that damages, if proven, would lie against Lord and P.A.W., but that Gordon had made no effort to establish damages, despite the indication in the complaint (later orally disavowed) that he would and the court's invitation at trial to do so. In light of this conscious by-passing of a damages theory at trial, the court then rejected Gordon's post-trial motions under Fed.R.Civ.P. 59(a), 60(b), to amend the judgment to reflect Lord's and P.A.W.'s liability to Gordon in damages or, in the alternative, to hold a new trial limited to the issue of damages.

On appeal, Gordon contests the district court's understanding of rescission as a remedy available only against the fraudulent seller. Alternatively, he renews his request for an opportunity to prove damages against those who fraudulently induced his purchase. In addition, by challenging the court's conclusion that Elpac was not guilty of securities fraud, Gordon seeks to enlarge the group from which he might recover under either a rescission or damages theory. Burr does not appeal from the judgment against him; Elpac defends the finding in its favor; and Lord and P.A.W. cross-appeal from the adjudication of their violations, which would become relevant in the event that this court either accepts the appellant's characterization of the scope of rescission relief or orders a new trial on damages.

For the reasons detailed below, we disagree with the district court's view of the remedy of rescission and find it applicable against persons not in privity with the defrauded purchaser but who are party to the fraud. Because we also differ with the district court as to the liability of P.A.W., this reversal on the issue of rescission adds only Lord to those from whom Gordon may seek restitution of his purchase price. In all other respects, we affirm.

## I. THE FACTS

Gordon became interested in purchasing Elpac stock as a result of a fortuitous encounter in June, 1968, with How-ard Mann, an old acquaintance who had recently bought 5,000 shares of Elpac. Both Mann and his companion at the time, Lord, spoke highly to Gordon of Elpac stock. Shortly thereafter, Gordon received a telephone call from Lord inviting him to a meeting of prospective purchasers of a new Elpac offering. Gordon attended the select gathering, which included two brokers from P.A.W. in addition to Lord; all present, except Lord, were strangers to Gordon. At the meeting, Burr, president of Elpac at the time, offered to sell 20,000 shares of his holdings in Elpac. He asserted, however, that he would sell no shares to the group unless they agreed to purchase all 20,000. By reference to subsequent events, the district court found that this statement constituted a material misrepresentation in violation of § 10(b) of the 1934 Act. 366 F.Supp. at 164.

The group departed without any commitments made. Within two weeks, however, Lord informed Gordon that the other offerees had already completed documents to expedite their purchase and thus that the ostensibly requisite block purchase awaited only Gordon's completion of these documents for its speedy realization. This statement, belied by later developments, became a basis for Lord's § 10(b) liability. 366 F. Supp. at 164.

Approximately one month after Gordon complied with this request, Burr pressed completion of the transaction. On August 20, he offered Gordon by telegram 4,500 shares at $10 per share. After a brief delay, Gordon arranged for the funds to be wired to Burr. On the 22nd, Gordon met with Lord and Burr, who both explained that, despite delays in the arrival of documents approving the sale as well as sundry other apparent irregularities, there were no problems with either the Burr offering or Elpac's business health in general. They specifically reassured Gordon that the other offerees had already made payment for their shares—a material misrepresentation, in the court's view. 366 F.Supp. at 164.

Subsequently, Gordon fruitlessly sought to locate Lord in order to inquire about the whereabouts of the documents of approval and, now, his stock certificates as well. When he telephoned and visited P.A.W.'s offices in search of Lord, the firm's employees indicated only that Lord was not in—not, as was in fact the case, that Lord had left the firm in late 1968. Finally, Gordon managed to reach Lord, who told him that the certificates were at P.A.W. On this second trip to the firm's offices, Gordon did not find his certificates. He did meet, however, one of the offerees present at the June, 1968, meeting, and the latter informed Gordon that neither he nor any of the others who attended the meeting had purchased stock from Burr. The certificates did arrive shortly after, but Gordon's attention had turned to procuring a refund of the $45,000 which he had invested in the stock—already a losing venture. Unable to procure the refund by persuasion alone, Gordon brought the instant suit for rescission based on various alleged misrepresentations made to him by Burr and Lord of facts material to his decision to purchase the stock. The court found "at least one determinative misstatement" by each, 366 F.Supp. at 164, but as indicated above, held that Lord's violation of the 1934 Act did not give rise to relief against him or P.A.W., which he held qualified as a "controlling person" within § 20(a) of the Act.

## II. RESCISSION AGAINST PERSONS NOT IN PRIVITY

Although Judge Bauman concluded that Lord and P.A.W. had violated § 10(b) and § 20(a) of the 1934 Act respectively, he found them to be outside the scope of an action for rescission. The court regarded rescission as a remedy available only against the tortfeasor who is party to the contract with the victim of the fraud; under this view, therefore, rescission relief would apply only to Burr, the seller. Where an action for rescission is based on a contract theory—mistake, or breach of contract—this circumscription of the class from whom restitution may be sought is undoubtedly correct. *See generally,* 3 A. Corbin, Contracts § 613 (1960); 5 *id.* § 1104. But where such a suit is predicated instead on fraud, the authorities do not adhere to a privity theory with the uniformity which the district court—as one infers from its essentially parenthetical disposition of the issue [3] —apparently assumed. *See* cases cited *infra.* As indicated below, we believe that the district court took too narrow a view of its powers as a court of equity and erred in placing a violator of § 10(b) or § 20(a) beyond the reach of a rescission remedy. Because we resolve this issue in the appellant's favor, we need not review his alternative claim that the court abused its discretion in not granting his post-trial motions regarding a damages award.

■ The majority view regarding the availability of rescission against parties not in privity with the defrauded person favors a broad conception of the scope of rescission relief where the theory relied upon is fraud. Thus, the New York courts have long held rescission applicable against a defrauder not in privity of contract with the victim of the fraud. *See,* Keskal v. Modrakowski, 249 N.Y. 406, 164 N.E. 333 (1928); Kaufman v. Jaffee, 244 App. Div. 344, 279 N.Y.S. 392 (1st Dept. 1935).[4] Iowa's high court was emphatic to similar effect:

Of course, if the principal makes restoration, there is an end. But if he

---

3. It should be noted at the outset that the discussion of the liability of Lord, Elpac and P.A.W. is rendered wholly academic by plaintiff's choice of the remedy of rescission . . . which is available only against Burr, the seller of the securities.

4. Although Gordon urges Mack v. Latta, 178 N.Y. 525, 71 N.E. 97 (1904), as authority for his position and the appellees dispute its applicability, we need not decide among their competing interpretations of *Mack.* The appellees argue that *Mack* holds no more than that a court sitting in equity will permit

does not restore, why should not the agent be made to return money that would never have reached the principal if the agent had not, by fraud, induced the one he dealt with to part with the money?

Peterson v. McManus, 187 Iowa 522, 546, 172 N.W. 460, 469 (1919). *See also,* Cox v. National Coal & Oil Investment Co., 61 W.Va. 291, 56 S.E. 494 (1907). In Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968),· aff'd in part, rev'd in part & remanded, 422 F.2d 1124 (4th Cir. 1970), 343 F.Supp. 245 (D.Md.1972), aff'd in part, rev'd in part & remanded, 488 F.2d 912 (4th Cir. 1973), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974), the district court granted rescission against the co-partners of W. E. Hutton & Co., a brokerage firm, for misrepresentations made in arranging a sale of oil and gas production payments from Trice Production Company to the plaintiff university. Although the Fourth Circuit reversed portions of both lower court orders, it plainly upheld the lower court's

conception of rescission as a remedy available against persons not in privity of contract with the victim of a fraud. Among the violations of the securities laws to which the court had applied this expansive view of rescission was— as in the instant case—a violation of § 10(b) of the 1934 Act. The First Circuit has also approved the application of rescission against tortfeasors not in privity with the defrauded party. Cady v. Murphy, 113 F.2d 988, 991 (1st Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940) (dictum). Indeed, the only federal or upper-level state court decision we have found to the contrary is Huffman v. Bankers Automobile Insurance Co., 112 Neb. 283, 200 N.W. 994 (1924), an opinion sharply criticized, 3 Neb.L.Bull. 436 (1925), shortly after its rendition.[5] Moreover, this resolution of the problem is indicated by a consideration of the basic equities of the situation.

As between two tortfeasors, one the seller and the other not a privy to the transaction, it is desirable that the sel-

---

joinder of an action for damages against tortfeasors not in privity with the defrauded party, and a bill for rescission against the fraudulent seller. Under their view, then, the case deals with a procedural issue (joinder), not the substantive problem of the persons against whom a bill in rescission may lie. This may well capture what the *Mack* court meant. Subsequent to *Mack,* however, the New York Court of Appeals has made clear that it reads that case for—or at least regards as *Mack's ratio decidendi*—the proposition propounded by the appellant. *See,* Keskal v. Modrakowski, *supra.* Whatever the court in *Mack* intended to say, then, is rather beside the point, for the state's high court has since elucidated in no uncertain terms that New York recognizes the availability of rescission against tortfeasors not in privity with the victim of the fraud.

5. Although Professor Loss seems in a passing reference to resolve availability in the negative, 3 L. Loss, Securities Regulation 1627 (2d ed. 1961), he elsewhere clarifies his position on this issue along the lines which we suggest, 3 *id.* 1713–15, 1769–70. The Second Restatement of Agency (1958) also offers support for allowing rescission relief against all persons party to a fraud:

§ 339.   Other Party Rescinds for Cause Existing at Time of Transaction;

Principal Disclosed or Partially Disclosed

An agent who has received things from another for a disclosed or partially disclosed principal in a transaction conducted by him has a duty to return them or their proceeds if the other rescinds the transaction for a cause existing at the time of their receipt, to the extent that the agent has not, before notice of rescission and in good faith, changed his position.

\*      \*      \*      \*      \*

[Comment:]

f.  *Change of position.* A person who, as agent, receives things from a third person for the principal is not thereby under a duty to return what he has received if, before demand, he has in good faith changed his position.

\*      \*      \*      \*      \*

If the agent has notice that the other has rescinded or, if he learns of facts from which he should realize that the other is entitled to and will demand rescission, *as where the agent or principal was fraudulent in inducing the transaction,* a subsequent change of position does not relieve him from the duty of returning what he has received.  .  .  .

(Emphasis added). *See also,* Comment, 3 Neb.L.Bull. 436 (1925).

ler be the person from whom the purchaser recover; otherwise, the seller will benefit from his fraud to the extent of the purchase price. The choice, then is between returning the seller to the status quo prevailing prior to the fraud or forcing the defrauder not in privity to a worse status than he occupied quo ante. To avoid unjust enrichment, general equitable principles indicate the preferability of the purchaser pursuing first the seller, rather than his partner in the fraud. However, as between the innocent purchaser and the wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo.

Since the district court erred in its ruling on rescission, we reverse as to the availability of rescission against Lord and P.A.W. insofar as they may be violators of the 1934 Act. Accordingly, their cross-appeals, disputing the court's finding that they violated the Act, must now be considered.

## III. THE CROSS-APPEALS

Judge Bauman held Lord in violation of § 10(b) on the basis of two misrepresentations: shortly after the June, 1968, meeting, Lord advised Gordon that the other offerees had already indicated their intention to purchase by completing certain documents; and the day after Gordon wired Burr the funds, Lord (along with Burr) reassured Gordon that the other offerees had also completed their purchases. On appeal, Lord concedes that the court enunciated the correct standard for determining the presence of a § 10(b) violation. He differs, though, with the court's application of this standard. Specifically, Lord contends that the representations which Judge Bauman singled out as violative of the 1934 Act were neither false nor material within the meaning of § 10(b) and, in any event, could not have been a proximate cause of Gordon's purchase of the Elpac stock.

We agree that the court below correctly stated the § 10(b) standard. *See generally,* List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied sub nom., List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and find substantial evidence in the record to support its application of the standard to Lord's two statements. The misrepresentations as to participation of the others were clearly material to one in Gordon's position contemplating a substantial investment in the venture painted as it was as a simultaneous purchase by all the members of the group. Accordingly, we uphold Lord's liability to Gordon for violating § 10(b) of the 1934 Act.

If P.A.W. is also liable to Gordon, it must be derivatively—as a "controlling person" of Lord, within the meaning of § 20(a) of the 1934 Act. In Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973) (*en banc*), we had occasion to comment on the scope of the secondary liability established by § 20(a):

> The intent of Congress in adding this section . . . was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.

In light of the evidence marshalled by Judge Bauman relevant to P.A.W.'s culpability as well as his remarks regarding the applicable standard, we are convinced that the court erred in applying too stringent a test of liability to P.A.W. Significantly, Gordon was not a regular customer of the firm and P.A.W. did not manage the Burr transaction; its brokers at the June, 1968, meeting were present in their private capacities, not as representatives of the firm. But the court minimized the importance of "[t]hese facts . . . [for they] only tend to establish that P.A.W. could not be held primarily liable under § 10 (b); the standard under § 20(a) is a

*far* lower one." 366 F.Supp. at 168 (emphasis added). We fail to find in the record support for a finding that P.A.W. had knowledge of the fraudulent representations or in any meaningful sense culpably participated in them. We conclude that the district court required P.A.W. to vindicate its good faith after a lesser showing by Gordon of P.A.W.'s culpability than § 20(a) demands. *See,* Lanza v. Drexel & Co., *supra; cf.* Securities and Exchange Commission v. Lum's Inc., 365 F.Supp. 1046, 1064–1065 (S.D.N.Y.1973). The court's conclusion that P.A.W. is liable to Gordon for violating § 20(a) of the 1934 Act must therefore be reversed.

### IV.  LIABILITY OF ELPAC

 Like P.A.W., Elpac stands to be adjudged liable to Gordon in rescission only derivatively—in this instance, for Burr's violation of § 10(b). The record however, is lacking in evidence that Burr was acting for Elpac in his sale of his own shares or his representations to Gordon.

Though in effect conceding his failure at trial to offer positive proof of Elpac's culpability, Gordon seeks to predicate § 20(a) liability on the negative inference which the court might have drawn from Elpac's failure to present certain evidence at trial conceivably within its ability to produce. Plainly, this inference is far less compulsory than Gordon would have it. Kirby v. Tallmadge, 160 U.S. 379, 383, 16 S.Ct. 349, 40 L.Ed. 463 (1896), cited by Gordon as authority and quoted by him at length in his brief, characterizes a failure to produce evidence within one's control as no more than "a proper subject of comment." Whatever inference the court below *may* have drawn from Elpac's alleged non-production of evidence,[6] it was hardly error for the court not to make this permissible inference. In any event, it appears highly

dubious that this inference from non-production of evidence *could* supply sufficient evidence to hold Elpac liable under § 20(a). We reject Gordon's claim that Elpac violated § 20(a) of the 1934 Act.

Reversed as to availability of rescission against Lord and as to liability of Philips, Appel & Walden, Inc., and remanded for entry of appropriate judgment; otherwise affirmed.

---

6. Even on its own terms, this claim of non-production of evidence is unconvincing. For at least one piece of allegedly withheld evidence, minutes of a meeting, was in fact proffered by Elpac. Transcript at 258.