### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### LUM'S, INC., et al., Defendants.

### No. 70 Civ. 5280 HRT.

United States District Court,
S. D. New York.

Sept. 12, 1973.

William D. Moran, Regional Administrator, Securities and Exchange Commission, by John F. X. Peloso, Allan A. Martin, and Janice Handler, New York City, for plaintiff.

Royall, Koegel & Wells, New York City, by William R. Glendon and Guy C. Quinlan, New York City, for defendants Lum's, Inc. and Melvin Chasen.

Simpson, Thacher & Bartlett, New York City, by Stephen P. Duggan, Jr., James J. Hagan, and Michael V. Corrigan, New York City, for defendant Lehman Brothers.

## OPINION

TYLER, District Judge.

The Securities and Exchange Commission ("plaintiff" or "SEC") filed its civ-

il complaint for an injunction on December 2, 1970, alleging violations by defendants of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. The case was tried before the undersigned, sitting without a jury, on April 30, May 1, 2, 3 and 9, 1973. Prior to that time, defendants Simon, Sit, Jundt, and Investors Diversified Services, Inc. ("IDS") entered into stipulations of settlement with the plaintiff; final judgments of permanent injunctions by consent were entered against them pursuant to such settlement. Thus, the only defendants remaining in the action are Lum's, Inc. ("Lum's"), Melvin Chasen, and Lehman Brothers ("Lehman").

### The Pleadings and Parties

Defendant Lum's was at all material times a Florida corporation with its principal place of business in Miami, Florida. Originally a franchisor and operator of "fast-food" restaurants, Lum's acquired on October 1, 1969 Caesar's Palace, a large hotel-casino in Las Vegas, Nevada. Shortly after the acquisition, in October, 1969, Lum's became listed on the New York Stock Exchange. In the summer of 1971, Lum's Restaurant Corporation, a subsidiary of Lum's, Inc., was sold, and in December of that year Lum's became Caesar's World, Inc. For purposes of continuity, references to Lum's as defendant will be understood to include its successor corporation.

Defendant Melvin Chasen was at all material times the chief operating officer and a director of Lum's; in February, 1970 Chasen also became president of the company, and remained such until his departure in August, 1972.

Defendant Lehman Brothers is a registered broker-dealer firm with its principal place of business in New York City; it is a member of the New York, American, and other major stock exchanges, and a member of the National Association of Securities Dealers, Inc. At the time of the transactions in question here, Lehman Brothers was a partnership; on or about October 27, 1970, however, the broker-dealer trading function was transferred to a corporation known as Lehman Brothers, Inc. Defendant Simon was a registered representative and institutional salesman for defendant Lehman Brothers' Chicago office at all relevant times.

One of Simon's institutional customers was defendant Investors Diversified Services, Inc., a Minnesota corporation registered with the plaintiff as a broker-dealer and whose business consists principally in the management of a number of open-end registered investment companies. Defendant Sit is a vice president and senior portfolio manager with IDS; in November, 1969 he became directly responsible for the IDS New Dimensions Fund, Inc., which held in its portfolio as of January 8, 1970, approximately 40,000 shares of Lum's common stock at a cost basis of about $730,000. Defendant Jundt is also an employee of IDS; towards the end of December, 1969, in addition to his responsibilities as analyst in the restaurant area, he became manager of a part of the IDS Investors Variable Payment Fund, Inc., which held in its portfolio as of January 8, 1970, approximately 43,000 shares of Lum's common stock at a cost basis of about $1,400,000.

The critical allegations of the complaint charge essentially that on or about January 5, 1970 Chasen received earnings projections for Lum's second quarter and for the fiscal year ending July 31, 1970, which indicated a sharp downward revision in prior projections publicly released to the investment community; that Chasen communicated this material, non-public information to Simon on or about January 8, 1970; that Simon in turn conveyed the information to Sit and Jundt later that day; that Sit and Jundt on January 9, 1970, acting on this information, sold out their entire positions in Lum's common stock. These actions, it is contended, constitute violations of Section 10(b) and Rule 10b–5 by the participants. In addition, the SEC at the close of its case moved to

amend the pleadings to conform to the proof adduced, and asserted that defendant Lehman Brothers is liable as a participant under these provisions for its failure to supervise its employee Simon; the SEC also charges that Lehman Brothers is vicariously liable on the theory of *respondeat superior.*

### The Evidence

With a price tag of sixty million dollars, Caesar's Palace was a most significant acquisition for Lum's, and was expected to contribute approximately fifty percent of the consolidated profits. Some curiosity and confusion in the investment community apparently accompanied the acquisition of Caesar's Palace, and the change in the nature of business which it represented. Record winnings at the casino for the month of October also added to speculation. On November 19 and 20, 1969, Lum's hosted a "seminar" at Caesar's Palace for some sixty or so analysts, brokers and other financial managers, for the stated purpose of introducing the investment community to the changes which had occurred.

At that meeting, in an apparent effort to counter what to him seemed excessively bullish expectations about Lum's earnings being expressed by analysts, Melvin Chasen declared orally that Lum's earnings per share for the fiscal year ending July 31, 1970 would be in the range of $1.00 to $1.10. Chasen testified that it was generally the company's policy not to disclose earnings projections, and that prior to the meeting he had no intention of making such a disclosure. Indeed, the oral earnings estimate was based on a draft projection for fiscal 1970 which Earl Powell, then vice president of finance for Lum's, had happened to bring with him to the seminar; Chasen testified that he had not had time to study the draft before the meeting or to review it with Powell. This projection, moreover, was substantially lower than two previous estimates prepared for internal use in May and September, 1969.

Some time between November 20 and mid-December, Chasen reviewed the final version of these November projections (dated November 26) with Powell. Despite the fact that the estimated earnings per share for fiscal 1970 was only $.96 and he had just predicted a range of $1.00–$1.10 at the seminar, Chasen was very concerned about the accuracy of the figures, particularly the profits from the restaurant company (which he considered excessively high), and felt that more work was needed. Accordingly, Chasen directed Powell to go over the figures again; just before the annual stockholders' meeting, on December 16 or 17, preliminary figures on this revision were submitted, but were again sent back for further scrutiny.

### The Revised Projections

The task of revising the projections was substantially delegated to one Berton Perez, the Comptroller of Lum's. Perez finished the revisions on or about Monday, January 5, 1970; on Tuesday the sixth, Chasen received a schedule (SEC Exhibit 23–A) summarizing the results, and breaking down the discrepancies between this version and the original one dated November 26, 1969. The discrepancies reported in GX–23–A were significant: earnings per share for the year of $.76, down approximately 20% from the earlier $.96 per share estimate; net income for the second quarter $397,826, down $1,202,174 from the earlier projection of $1,640,000, resulting in an earnings per share for the quarter of $.06 vs. $.23 for the first quarter. Exhibit 23–A also reveals that the principal factors underlying the reduced projections were declines of almost $1.2 million in income from the restaurant company ("restaurant subs" on the exhibit), $450,185 in income from the casino at Caesar's Palace, and $479,869 in income from "rooms, food and beverages" at Caesar's Palace. It should be noted that these discrepancies refer to decreases in income; 23–A does not indicate any significant increase in expenses at Caesar's Palace (or elsewhere)

as the cause of the reduced projections of earnings.

Chasen testified that the results summarized in Exhibit 23-A were worse than he had expected, even though earlier he had been concerned that the November projections might have been too high. The day following his receipt of Exhibit 23-A, Chasen placed a call to David Bernstein, counsel to Lum's and a partner in the firm of Royall, Koegel & Wells, to discuss the revised projections. Chasen asked Bernstein whether he thought a press release was necessary under the circumstances; Bernstein replied that it probably was. But, since Chasen had not yet received the back-up figures, and had only the summary sheet, it was agreed that a decision on the release would not be made until the estimates were checked and confirmed.

Chasen also informed Bernstein that he would be talking to Simon the next day, and asked for Bernstein's legal opinion as to whether he might warn Simon of the reduced projections, "in view of our relationship with Simon". Bernstein replied that Chasen could so inform Simon, if he specified that the information was confidential and could not be acted upon.

*Simon's Relationship with Lum's*

To appreciate the background of this rather remarkable exchange, it is necessary to pause here and trace out the relationship between Lum's and Ben Simon. As an institutional salesman, Simon's principal duties were to convey to his accounts (most of which were institutions such as IDS) the products of Lehman Brothers' research, their projections and analyses; to sell their underwritings; and to otherwise solicit business. In the period 1968–70, Simon was particularly interested in—and familiar with—Lum's, which he had recommended to his customers. Because of this interest, Simon communicated often with the management of Lum's, and met and became friendly with Chasen some time in the latter part of 1968. According to Chasen, Simon gave him valuable advice

about rendering the company more attractive to the investment community, and helped in general to set up a dialogue between Lum's and that community. In addition, Simon had been particularly helpful in raising funds for the purchase of Caesar's Palace: he introduced Lum's to his clients, and in general "opened doors" for the company in this transaction. More specifically, Simon set up a meeting between Lum's and IDS, which eventuated in a purchase of $2.5 million of Lum's debentures by IDS.

Some time in the summer of 1969, furthermore, Simon was asked to become a director of Lum's; he was required to reject this request by his supervisor, Mr. Walter Scott, because of the potential conflict of interest such a situation might raise and because of a long-standing Lehman Brothers' policy not to become involved in gambling operations. Indeed, this latter policy also led Lehman to refuse to act as underwriter for the financing of the acquisition of Caesar's Palace.

Chasen testified that he thought of Simon as an institutional advisor to Lum's, even though Simon was neither an analyst nor an underwriter. Not surprisingly, Simon was afforded greater access to the company than most, and was in frequent contact with Chasen and others there. As part of what must be called the "accommodation" between Chasen and Simon, the latter had requested that he be informed in advance of changes confronting Lum's, for the stated purpose of avoiding the embarrassment of appearing to his clients to have failed to "do his homework" when such changes were made public. Simon had also stated that his customers owned 1½ million shares of Lum's and that he would not be in any position to use such information for trading, but rather was concerned with being unexpectedly surprised by any news.

At least partly through Simon, then, IDS became a large stock and debenture holder in Lum's. When Jundt in late December, 1969, became manager of a

part of the IDS Variable Payment Fund and expressed an interest in meeting with the management of Lum's to update his analysis, Simon was the one who arranged the meeting. Originally scheduled for sometime late in December, this appointment was postponed to Monday, January 12, 1970.

Chasen apparently became aware sometime the week of January 5 that he would be unable to attend this meeting, because of the need to be in Las Vegas for a hearing on the 12th. Accordingly, Chasen knew that he would have to call Simon to cancel the meeting with Jundt, since it was Simon who had originally set it up. And he knew that Simon would surely ask him if there were any changes at Lum's. Finally, Chasen intended that Simon would in turn call Jundt to inform the latter of the cancellation of the meeting.

*The "Tip"*

The following day, Thursday, January 8, Chasen talked to Simon between three and four P.M., Miami time (just after the 3:30 P.M. closing of the New York Stock Exchange, according to Simon). During the course of the conversation, Chasen informed Simon that he had to be in Las Vegas the next Monday and would thus be unable to meet with Jundt. A Saturday alternative was proposed. Simon asked if there was anything he should know. Chasen's version of the dialogue follows:

"I said 'I have some information and it is of a confidential nature and if I give it to you you have to act accordingly and not put me or you in an embarrassing position. On that basis do you want it?'

"He says, 'I want it, give it to me.'

"I said 'Our earnings projections for the second quarter are not up to snuff.'

"He said 'What seems to be the general problem?'

"I said, 'I am primarily concerned about the franchise sales and the restaurant company.'

"He said, 'Well, are you going to have a loss?'

"I said, 'No, I don't think it will be that bad.'

"He said, 'Okay, you know I know. I can handle it and protect myself.'

"I said, 'Listen, Ben, I am telling you only—I am keeping the faith you asked me to take.' "

Transcript at 195–6.

Upon further questioning by counsel for plaintiff, Chasen admitted that he also indicated that the results at Caesar's Palace for November and December had been unsatisfactory, that he didn't know the reason, and that he was going out there to find out. Upon cross examination, Chasen further stated that he might have given Simon a range or percentage (20%) by which earnings for the quarter had declined.

Simon's version of the conversation is somewhat different. He testified that he did not recall any mention of the "confidentiality" of the information; but he did admit that Chasen told him that Lum's second quarter earnings would be "less than anticipated" and that this was the first time he had heard about it. Simon stated that they did not discuss the range of the downward revision. On cross-examination by counsel for Lehman Brothers, Simon explained that he did not consider Chasen's information significant, since the first quarter's gain in earnings had given the projected year's earnings estimate a "substantial cushion"; he did not understand "less than anticipated" to mean "down" from prior year's results in the second quarter.

To the extent that resolution of these somewhat conflicting accounts is necessary, it should suffice to state that, on balance, I regard Chasen's version of events to be more credible than Simon's. In other words, I find that Chasen did communicate to Simon the highly relevant information that Lum's earnings would be substantially lower than originally anticipated, under circumstances, at least, which indicated the non-public

nature of the information. And, I conclude that Chasen told Simon of the unsatisfactory results at Caesar's Palace as well.

Simon called Chasen back shortly thereafter to relate that Jundt could not make the alternative Saturday meeting and that the latter was not very happy about the cancellation. Chasen testified that he said to Simon that he hoped Simon had not said anything to make Jundt unhappy—to which Simon said "no". Simon also admitted asking during this second conversation why earnings would be down; Chasen reportedly replied that they would discuss the matter on Saturday night if Simon and his wife came down. But, Simon never went to Florida that weekend, apparently because of bad weather.

*Conversations with IDS*

Subsequent to his first telephone call with Chasen, Simon had several conversations with people at IDS on January 8th and thereafter; but the memories of all involved are remarkably (and indeed, conveniently) hazy concerning the substance of what was said. To a significant extent, the following findings are necessarily based on the surrounding circumstances. Simon testified that he spoke with both Sit and Jundt on the eighth, but emphatically denied telling either that something was wrong with Lum's or with Caesar's Palace or even discussing second quarter earnings or costs at Caesar's Palace. Jundt, on the other hand, testified that, upon being informed of the cancellation, he remarked to Simon that something must be wrong and that Simon replied: "I have a gut feeling you may be right". In addition, Jundt testified that he told Simon he was going to have to get in touch with Lum's directly, but that Simon interjected: "No, let me get back to the company for you."

Shortly after the call from Simon, Jundt talked to his fellow workers Sit and Wesley Wadman, who was then an associate portfolio manager of the IDS Investors Stock Fund, which held $2½

million of Lum's subordinated convertible debentures. Sit testified that Jundt told him on Thursday morning that his meeting with Lum's management was cancelled because of a visit to Las Vegas; this was apparently the third time in recent months that management had become unavailable on short notice, and it concerned them. As Sit related, Lum's was a relatively high risk investment, and management had been inaccessible for some time. Sit placed a call to Chasen, but the latter was not there, nor did he return the call until the afternoon of the following day.

In the meantime, Sit called Simon sometime during the afternoon of the eighth—although his memory is far from clear on this. Apparently, Sit also told Simon that he was disturbed about Caesar's Palace, the declining price of Lum's stock over the past few months, and the inaccessibility of management. Sit added that he might have told Simon that he and Jundt had decided to sell. Although at trial Sit was unable to recall any other details of his conversation with Simon, he did remember that the latter did not quarrel with their decision —if he had so informed him. However, Sit did admit, upon a rereading of the transcript of his testimony before plaintiff on February 4, 1970, that Simon "ventured his guess about the higher expenses and lower earnings at Caesar's Palace and he emphasized at that time that that represented his own thinking, his own speculation." At trial, Sit testified that he gave this answer, but that he had no independent recollection of it or of its accuracy. Finally, Sit and Jundt had several discussions about Lum's that day during which Jundt recalls that Sit mentioned "increased costs" and that he assumed Sit had spoken with Simon.

*The January 9th Sale and its Aftermath*

A decision was made in the late afternoon of January 8 to sell off the positions in Lum's held by the funds under Jundt's and Sit's control, at a price of approximately $17.00 per share, some $2

per share below the closing market price the previous day. At the time of the sale, the average cost per share of the 43,000 shares held in the IDS Variable Fund was $32.87 per share; the average cost of the 40,000 shares in the IDS New Dimension Fund was $18.26.

Early on the morning of January 9, 1970, Sit placed the order with the IDS trading room to sell off the 83,000 shares. The sale was executed on the New York Stock Exchange at 10:30 A. M.; the purchaser was A. G. Becker; the sale was not executed by Lehman Brothers, nor did they receive any commission. After the order, Sit attended a regular 8:45 A.M. meeting of IDS portfolio managers, at which Wadman was also present, and reported about Lum's. Although Sit could not specifically recall at trial anything he said at that meeting, several extrinsic aids were proffered. First, there are the notes of Mr. Wadman made in the course of the meeting; although he has no independent recollection of the events, and despite his disclaimer of knowledge as to whether they comprised paraphrases, quotes, or conclusions, I find that they are sufficiently reliable to be admitted as evidence. They read: "Lums—second quarter—Caesar's Palace didn't do as well—expenses up sharply—earnings per share may be down."

Secondly, there is the deposition of Miss Jill Ryden before the SEC staff on April 29, 1970, admitted into evidence as SEC's Exhibit 40. Miss Ryden was the secretary who took notes of the morning meeting, and she testified that she remembered Sit saying that he had had a telephone call and that expenses were higher at Caesar's Palace. She also recalled that Sit said that the source of the call wished to remain anonymous. In addition, she remembers that there was a buzzing in the room, indicating concern, if not surprise, at Sit's remarks.

Thirdly, and most significantly, the original transcription of the summary of the morning meeting, typed up by Miss Ryden in due course after each meeting, had the following entry under Sit's name: "Caesar's Palace had a disappointing second quarter due to expenses which increased 40–50%". In her deposition, Miss Ryden described how she was about to duplicate and distribute the notes when Sit asked her to delete the reference to Caesar's Palace. This was the first time anyone had ever asked her to remove an entire reference to a company. She complied by applying "Sno-Pak" to the reference; although the original still remains legible, the xerox copies are "clean". Sit took away this original and kept it in his files until it was reclaimed during the course of the SEC investigation. The following week, or sometime thereafter, Sit returned to request that Miss Ryden retype the entire minutes, to remove the spacing caused by the Sno-Pak—in case they wanted to substitute this for the original in their files, as he testified.

Sit's decision to delete the reference to Caesar's Palace from the morning minutes was prompted by a telephone call from Simon sometime after the morning meeting. According to Sit, Simon called and said, "You know, my opinion you asked for yesterday, that is strictly my own view and I don't like to be quoted". Wadman also testified that Sit had told him he was going to change the minutes because of a telephone call from Simon. Sometime later that day, Simon called Wadman and began to refer to this matter; but the latter interrupted him and said something to the effect that, "It's already taken care of."

Meanwhile, on the morning of January 9, someone from Lum's called David Bernstein to relate that there was heavy trading in the stock; Bernstein in turn placed a call to Chasen in Miami. When Chasen came in (shortly thereafter between 10:45 and 11:00 A.M.), he returned the call in the presence of Powell. Bernstein informed them of the trading, and asked whether Chasen had disclosed the projection revisions to Simon. Chasen admitted that he had, but asserted that no one else had been told. Bernstein then offered to call Simon, since he

did not know him and could confront him more directly. Bernstein thereupon called Simon, who denied having passed along any information. Although the record is not clear at this point, I find that Simon called Sit at IDS after this first call from Bernstein, and after the execution of the trade.

Simon called Bernstein back again, at approximately 1 P.M. on January 9, to reaffirm that he had told no one of the developments related to him by Chasen. Trading in Lum's common stock was suspended on the New York Stock Exchange at 1:40 P.M., and at about 2:15, Lum's issued a press release (SEC Exhibit 3) reporting substantially lower earnings projections for the second quarter and a 20% decline in earnings for the first six months compared with the same period of the previous year.

A few minutes after the release was announced over the broad tape (2:45 P.M.), Simon called Sit to relate the news. Although Sit could not remember the details of the conversation, SEC Exhibit 48 purports to be Sit's contemporaneous notes. These indicate November and December break-evens at Caesar's Palace, and a second quarter lower than the second quarter in 1969. The date on the notes was originally 1–8–70, but there is a "9" written over the 8: Sit testified that the notes were originally undated, but that while he was getting them together for the SEC investigation he mistakenly put down the 8th instead of the 9th. This is somewhat suspicious, but on balance I am inclined to believe Sit. The significant thing to note here, however, is the fact that the broad tape does not indicate anywhere that Caesar's Palace experienced a break-even in November and December: these particular details were included in the revised projections, but were not disclosed to the public at that time.

Also on the afternoon of the 9th, after the issue of the press release, Chasen returned Sit's call of the previous day. He apologized for not calling earlier, but then added (somewhat mysteriously) that he had not wanted to prejudice Sit's action. Then he proceeded to relate in substance the information of the revised projections. By the end of the day on January 9, trading in Lum's had still not resumed on the New York Stock Exchange; the results for the day were that 325,000 shares had traded, with the last sale being executed at 16⅞, off 2⅛.

The following Monday, January 12, Simon called Bernstein, allegedly to thank him for his role in inducing Lum's to issue a press release and thus unfetter him in his dealings with his clients. In the course of the conversation, Bernstein disclosed that he was preparing a letter in response to a request by the New York Stock Exchange, to inform them of any facts which might have explained the Friday trading in Lum's. Bernstein added that he would have to mention Simon; the latter replied that this might lead to problems for him at Lehman Brothers.

Several days later, on January 14, the principals of Lum's met at Caesar's Palace to discuss the draft letter to the NYSE prepared by Bernstein. Also present at the meeting was William D. Kimpton, a friend of Simon's and at that time employed by Lehman in the corporate finance division of their San Francisco office. Kimpton, who was on close terms with Chasen and others at Lum's, had been informed of Simon's conversation with Bernstein, and sought on his own to intervene for Simon. According to the testimony at trial, Kimpton thought that the proposed release unfairly singled out Simon, and that Simon had had no more information than the rest of the financial community. At the meeting, it also came out that Earl Powell had been telling several analysts (seven or eight, a number which surprised Chasen) that the second quarter would not be as good as the prior one—although everyone at the meeting save Kimpton maintained that there were major differences between what Powell had said and what Chasen had told Simon. In any event, it was decided to delete from page two of the draft letter (SEC Exhibit 7) the following phrase:

"one person had been given an indication that Lum's was reviewing its second quarter earnings projections with a view to a possible downward revision. . . ."

### Liability

One of the primary objects of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., was to "insure the maintenance of fair and honest markets" for the trading of securities. 15 U.S.C. § 78b. It was decided by the drafters that the public interest required prevention of trading or speculation by insiders on information not generally available: only when information concerning the company whose securities were traded was available to all could the market price reflect the true "worth" of the stock through the operation of supply and demand. Selective disclosures, or misleading statements, it was recognized, would lead to distortions in the market and unfair treatment of the general trading public. S.Rep.No.792, 73rd Cong.2d Sess. 9; S.Rep.No.1455, 73rd Cong.2nd Sess. 68; H.Rep.No.1383, 73rd Cong.2nd Sess. 11 (1934).

Accordingly, Rule 10b–5 of the Securities and Exchange Commission was promulgated pursuant to § 10(b) of the Act to render it "unlawful for any person directly or indirectly . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." As the Supreme Court has recently reaffirmed, the prohibitions contained in § 10(b) and Rule 10b–5 "are broad and, by repeated use of the word 'any', are obviously meant to be inclusive." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972).

### Liability of Chasen

■ It has been the rule of this Circuit for some time that it is a violation of Section 10(b) and Rule 10b–5 for a person having access to material nonpublic corporate information to trade upon or transmit such information under circumstances where it is foreseeable that it will or might be traded upon and a purchase or sale is in fact executed. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). It is undisputed that during the week of January 5, 1970, Chasen, as chief operating officer of Lum's, came into possession of nonpublic corporate information in the form of the revised earnings projections; these revisions disclosed a very substantial reduction in the earnings estimates orally announced by Chasen less than two months earlier at the "seminar". And it is undoubted that this information not only "might" but "would have been considered important by a reasonable shareholder." Gerstle v. Gamble-Skogmo, Inc., 478 F. 2d 1281 (2d Cir. 1973).

Chasen candidly admitted that he disclosed the results of the projection revisions to Simon. Counsel for Chasen and Lum's strenuously argue, however, that there is no evidence that Chasen intended the information to be "relied upon" or utilized by investors; rather, it was for Simon's ears alone, as indicated by the caveat of "confidentiality" allegedly made by Chasen. Chasen's "good faith", in this view, is a complete defense, since it is contended that there can be no "manipulative or deceptive device" within the meaning of § 10(b) without a showing of actual intent to deceive or defraud.

■■ Although it is the case that in a private action for damages under § 10(b) some stricter standard of *scienter* beyond negligence is necessary, Shemtob v. Shearson, Hammill & Co., Inc., 448 F.2d 442 (2d Cir. 1971); Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969) cert. denied 397 U. S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), it is also the rule that ". . . in an enforcement proceeding for equitable or prophylactic relief, . . . mere negligence is a sufficient basis for

liability." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 (2d Cir. 1972); see, also, SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 854–855. Granted that what constitutes negligent conduct in this type of situation is far from clear, it is evident that Chasen owed a primary or fiduciary duty to the investing public not to abuse his position as insider in possession of confidential corporate information by disclosing it to someone who might use it for personal purposes. Put somewhat differently, the issue could be expressed in terms of whether Chasen had a legitimate corporate purpose in disclosing the earnings projections to Simon. See 2 Bromberg, Securities Law, § 7.5(3)(d) (1971).

■ Here, Simon was neither underwriter, accountant, or lawyer but rather an institutional salesman whose clients held large amounts of Lum's stock. As part of what earlier was styled the "accommodation" between Simon and the management of Lum's, Simon had requested that he be informed in advance of any significant changes in the corporation's position, not to assist Lum's, but to avoid appearing unprepared or uninformed to his clients. This is just the sort of selective disclosure for personal purposes that ultimately works unfairness in the markets: some people are better informed and thus can conduct better analyses, in reaching decisions to act, because of unfair advantages not enjoyed by others—even if they do not take direct action on the specific information conveyed. Thus I conclude that Chasen breached his duty by transmitting the information to Simon, and should be liable for the foreseeable consequences of that act.

This leads to the second aspect of this particular negligence issue: should Chasen have known that Simon would pass along the confidential information to his clients? Much is made of the close working relationship between Chasen and Simon, and of the trust which Chasen placed in Simon as signified by the offer to join the board of directors. But this cuts two ways: being cognizant of Simon's responsibilities vis-a-vis his clients, Chasen very clearly desired to "warn" him of the new projections. Although Simon denied any mention of the confidentiality of the information, Chasen's version of the conversation can be read as a caution to Simon to cover his tracks in making use of the information so as not to place himself or Chasen "in an embarrassing position." Chasen knew that Simon would be calling IDS subsequent to their conversation, and that inquiries would be made concerning the status of Lum's. Surely Chasen ought to have known that Simon would be placed in an untenable position by virtue of the "tip" he had just received: if Simon denied anything were wrong at Lum's, he would be misrepresenting the situation; if he disclosed the information, he would be guilty of violating Rule 10b–5; if he said nothing, he would either appear to be ignorant or to be hiding something, and in either event would jeopardize his relationship with his client.

■ ■ In sum, I find that while Chasen possibly believed that Simon would not breach his confidence, this belief was not "reasonable under the circumstances . . .", and that to hold him liable for the foreseeable consequences of his act would be consistent with "the deterrence objective of the Rule [10b–5]." SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 855–856. Recognizing that reliance on the erroneous advice of counsel might be evidence of "good faith" in defending against a charge of actual fraud, I nonetheless conclude that it is insufficient in this type of enforcement proceeding where the defendant is in possession of all of the relevant facts necessary to support a finding of negligence. As the Supreme Court noted in an analogous situation, honesty in a specific instance is no answer to a practice presenting a

potential for abuse. SEC v. Capital Gains Research Bureau, Inc., *supra*, 375 U.S. at 200–201, 84 S.Ct. 275.

As a second line of defense, it is contended that the plaintiff has failed to establish that the disclosures from Chasen to Simon were made "in connection with the purchase or sale" of Lum's stock on the grounds that there is no competent evidence that Simon passed on to IDS any of the information he received or that such information formed a basis for the subsequent sale of the IDS positions. Another way of putting the latter contention is that Simon conveyed no material information to IDS.

██ ██ Although the "in connection with" and "materiality of the information" requirements are generally treated as separate elements of liability in a 10b–5 action, see, e. g. SEC v. Texas Gulf Sulphur Co., *supra*, the two would seem to come together when a discreet bit of inside information is conveyed and allegedly triggers a discreet sale of a security. It is the selective disclosure of information which acts as a fraud or deceit upon the public when that information is utilized in the market for trading. Thus, in Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, 480 F.2d 341 at 374 (2d Cir. March 16, 1973), the court observed that materiality is a principle of "constructive reliance", primarily utilized to resolve the difficulties of proving causation in class actions. Cf., List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.) cert. denied 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). In an enforcement proceeding, on the other hand, no proof of reliance is necessary, and the only causal nexus required is the statutory "connection with the purchase or sale of a security."

██ For the following reasons, I determine that there was a sufficient showing of the transmission of material information and of its connection to the IDS sale to establish liability on the part of Chasen and Lum's. On this point there is indeed a relative dearth of direct evidence in the record; but defendants overlook certain highly significant direct and circumstantial proof. First, Jundt testified that he remarked to Simon that something must be wrong at Caesar's Palace, and that the latter responded, "I have a gut feeling you're right". Sit recalled that Simon "did not quarrel" with their decision to sell. More significantly, Sit in his testimony before the SEC staff reported that Simon had ventured as a personal conclusion that Caesar's Palace would have higher expenses and lower earnings. This evidence alone might be dispositive, given Simon's unique relationship to Lum's and his prior recommendations to IDS to buy Lum's stock. In *Texas Gulf*, all that defendant Darke had apparently said to one of his alleged tippees was that the company was "a good buy". And it should be remembered that the prohibitions of Rule 10b–5 extend to "recommending" the stock affected while in receipt of any material inside information. SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 848. The peculiarly convenient memory lapses of the witnesses, moreover, raise the suspicion that more was conveyed.

There is also the circumstantial evidence. IDS sold off its entire block of 83,000 shares in Lum's almost immediately after a telephone call from Simon, which itself followed the revelations by Chasen.[1] Had Sit and Jundt been primarily concerned with the possible trou-

---

1. Defendants emphasize that IDS had reached a tentative decision to sell its holdings in Lum's as early as September, 1969 and had already sold off 42,000 shares. Jundt as an analyst had recommended sale of the stock because of the riskiness of the gambling operations and the growing difficulties with the franchising and restaurant operations. Indeed, this was apparently general knowledge, for Lum's stock suffered a relative decline in its market price during this period. Nevertheless, this ignores the fact that in January, 1970 IDS had not yet sold off its holdings when they could have done so at any time. And despite misgivings about the franchising business, the financial community—including IDS—apparently had taken Chasen at his word when he estimated earnings in November of $1.00 to $1.10.

ble with Lum's represented by the inaccessibility of management, it is unlikely that they would have sold off their shares in a single transaction for a substantially reduced price—a step which even Wadman found surprising. The telephone calls by Simon to Sit, Wadman and Bernstein, among others, after the sale of the IDS stock, and the subsequent deletion by Sit of the reference to Caesar's Palace in the IDS morning minutes are also eloquent testimony that Simon must have transmitted some "tip" to IDS which was in turn acted upon.

Defendants also stress the fact that nothing in SEC Exhibit 23a contains any reference to increased expenses at Caesar's Palace. But the discrepancy between Chasen's disclosures and Sit's report to the IDS Friday meeting does not prove that Simon remained silent about Lum's earnings projections or refrained from recommending a sale of Lum's stock during his conversations with Jundt and Sit. Given that we are dealing with intelligent and articulate businessmen, it is not unreasonable to conclude that Simon, one of the most astute actors involved herein, "tipped" IDS directly or indirectly—and did so in such a manner that tracing the source of this information would be difficult. Thus, Simon probably said that it was his own personal impression that expenses were up and earnings down at Caesar's Palace (knowing IDS to be principally concerned with the riskiness of Caesar's Palace and because speculation had centered largely about results there). But the substance of the message—that Lum's second quarter would be down—could still be conveyed, since it was recognized by all that Caesar's Palace contributed at least half of the earnings of Lum's, and that any losses felt in one profit center of this size would be felt by the company as a whole. Accepting that it might have been "common knowledge" that Lum's would not do as well in the second quarter of fiscal 1970 and that the food franchise industry was having problems, the magnitude of the earnings revisions were not anticipated

even by management—let alone IDS, which still listed on its computer printout for 1/9/70 earnings of $1.10.

That this information was not immaterial to IDS in Sit and Jundt's decision to sell can be found in the surprise which attended Sit's disclosure thereof to those attending the Friday morning meeting, while indicating that the source wished to remain anonymous. If Sit had truly considered the information insignificant or unreliable, it is altogether unlikely that he would have reported it. Finally, Sit and Jundt were aware of Simon's special relationship with the management of Lum's and of the fact that Simon had just finished talking with Chasen while they had been unable to reach him.

■ Thus, I conclude that the substance of Simon's tip to IDS was that Lum's second quarter earnings would be less than anticipated, and that this tip was ". . . material in the sense that a reasonable investor might have considered them important in the making of this decision." Affiliated Ute Citizens of Utah v. United States, *supra*, 406 U.S. at 153–154, 92 S.Ct. at 1472. See also Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, *supra*; cf. Gerstle v. Gamble-Skogmo, Inc., *supra*, 478 F.2d at 1301–1303. In addition, I find that it was considered important in fact by Sit and Jundt. This chain of "acts" is sufficient to establish Chasen's liability as a non-trading tipper under section 10(b) and Rule 10b–5. SEC v. Texas Gulf Sulphur Co., *supra*; Shapiro v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, 353 F.Supp. 264 (S.D.N.Y.1972). If it be argued that the direct proof is slender, this conclusion nonetheless is facilitated by the recognition that:

> "Whatever elements (like reliance or privity) may be necessary in a private action, an SEC enforcement proceeding requires only a bare minimum of (1) use of jurisdictional means, (2) connection with a purchase or sale of a security, (3) misrepresentation, mis-

leading omission, or other deception or manipulation and (4) materiality of the misrepresentation of omission." Bromberg, Securities Law, *supra*, § 10.1 at 235.

*Liability of Lum's*

█ Counsel for Lum's and Chasen do not deny that Chasen's communications with Simon were acts which were performed by a director and chief executive of Lum's and which should therefore also be imputed to the corporation. In making the original oral projections and subsequent disclosures, Chasen was acting in much the same fashion as the principals of Texas Gulf Sulphur Co. Because a corporation acts through its directors and managing officers, and since the acts challenged are essentially "corporate practices", it might be asserted that Lum's is liable as a participant. See *Texas Gulf, supra*, 401 F.2d at 861. Such liability might be considered analogous to the absolute liability of the issuer for false registration statements under section 11(b) of the 1933 Act, 15 U.S.C. § 77k(b). In the alternative, Lum's might be considered, a "controlling person" under § 20 of the 1934 Act, 15 U.S.C. § 78t, and liable because the imputation of knowledge of its agents to the corporation destroys the "good faith" defense provided in that section. This "conceptual problem" of *scienter* has been recently noted by Judge Friendly in Gerstle v. Gamble-Skogmo, Inc., *supra*, 478 F.2d at 1299, 1301, notes 18 and 20, citing Jennings & Marsh, Securities Regulation 1358–59 (3d ed. 1972).

I have been unable to find any authority dispositive of the issue. In general, courts have held a corporation-issuer liable on agency principles for what can be deemed the corporate acts of its principal agents without much discussion, and it seems to me that this is the appropriate analysis—if only because it is diffi-

cult to conceive of a corporation acting in any other way than by its managing officers and directors. On this basis I conclude that Lum's is also liable for the violation of § 10(b) and Rule 10b–5 discussed above.

*Liability of Lehman Brothers*

1. *Respondeat superior*

Plaintiff SEC seeks in this action to impose liability on defendant Lehman Brothers (then a partnership) as an employer on the theory of *respondeat superior*. The SEC argues forcefully that Lehman should be liable for the acts of its employee Simon, committed in the course of his employment, regardless of any possible good faith defense which Lehman might have under § 20a. Indeed, the SEC in its reply brief at page 6 asserts: "The Commission has never alleged in this action, in the complaint or otherwise, that Lehman's liability is based upon the provisions of Section 20(a)." And the complaint is barren of any reference to Lehman's participation in or knowledge of the acts constituting the offense other than the bare allegation that it was Simon's employer. It should be noted, however, that plaintiff did move at the end of trial to amend the complaint to charge Lehman with failure to supervise its employee; this failure, it is asserted, is sufficient to establish liability as a participant and might also provide a basis for finding that Lehman induced the violation under § 20(a).[2]

Plaintiff asserts that, "In its administrative disciplinary proceedings, the Commission has consistently held that a fraud violation by an officer or employee of a broker-dealer acting within the scope of his employment is necessarily a violation of the broker-dealer itself and the degree of fault of the broker-dealer is a factor which should be considered only in determining the sanc-

---

2. Parenthetically, it should be stated that it was not exactly clear what the position of plaintiff is in this respect. The complaint itself sheds little light; the arguments in the briefs take one position, then seemingly slide off into another. And the authorities cited for several propositions are, to put it kindly, not completely on point.

tion to be imposed." Plaintiff's brief at 19. Such a standard, it is claimed, would greatly enhance the Commission's capability for policing the exchanges and for deterring violations of the rules.

Aside from its own administrative determinations, plaintiff relies principally upon two cases for authority for the above position: Armstrong, Jones & Co. v. SEC, 421 F.2d 359 (6th Cir.), cert. denied 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); SEC v. Charles A. Morris & Associates, Inc., CCH Fed. Sec.L.Rep. ¶ 93,756 (W.D.Tenn.1973). In *Armstrong, Jones*, the court upheld the liability of the defendant broker-dealer on the theory of *respondeat superior,* but cited as authority only prior SEC proceedings in this respect. And in *Morris,* the trial judge found the defendant liable as participant for maintaining a "boiler room operation", as well as liable on the basis of *respondeat superior,* citing *Armstrong, Jones.*

Still probably the most researched opinion in this area is that of Judge Frank Kaufman in Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D. Md.1968), aff'd in part, rev'd. in part and remanded, 422 F.2d 1124 (4th Cir. 1970), an action brought under section 12(2) of the 1933 Act. It was there held that the partners of a broker-dealer were liable as employers for the frauds of their employee (the manager of a department but not a partner) committed in the course of his employment, and that the "controlling persons" standard of liability (under section 15 of the Act) did not apply to employer-employee relationships.

"What legislative history there is does not indicate that Congress intended Section 15, originally or as amended, to serve as a limitation on liability. The section would seem, on the other hand, to have been intended to establish a 'controlling person' liability which would supplement, and extend beyond, common law principles of agency and *respondeat superior.*" 297 F.Supp. at 1211–1212, aff'd. on this point, 422 F.2d at 1130.

*Johns Hopkins* has been cited for the proposition that the controlling persons sections of the 1933 and 1934 Acts are not exclusive. And it has led at least one commentator to remark that:

"It seems likely that . . . the specific defenses of the controlling persons sections of the 1933 and 1934 Acts will be available only in those situations in which use of those sections is necessary to impose liability. If other theories of liability such as agency, aiding and abetting, conspiracy, or direct participation are used, then the 'special' defenses of the controlling persons sections will apparently be unavailable." Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution", 120 U. Penn.L.Rev. 597, 608 (April 1972). See also, Bromberg, Securities Law, *supra,* § 6.1 (100) at 107, note 1.

The problem is a perplexing one. Yet, I do not regard the cases cited above as controlling or even persuasive, nor am I able to agree that liability can or should be imposed upon Lehman on the theory of *respondeat superior,* without regard to any possible lack of "fault" on its part. First, the Commission's position ignores the relatively numerous cases where section 20(a) has been applied to establish liability of broker-dealers for the acts of their employees. See, e. g., Douglass v. Glen E. Hinton Investments, Inc., 440 F.2d 912 (9th Cir. 1971); Richardson v. Mac Arthur, 451 F.2d 35 (10th Cir. 1971); Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970); Kamen & Co. v. Paul H. Aschkar & Company, 382 F.2d 689 (9th Cir. 1967), cert. granted 390 U.S. 942, 88 S. Ct. 1021, 19 L.Ed.2d 1129, cert. dismissed 393 U.S. 801, 89 S.Ct. 40, 21 L. Ed.2d 85 (1968).

Secondly, several circuits have held or at least implied that the *respondeat superior* standard does not apply to Security Acts cases. Thus, in *Kamen, supra* the trial court awarded judgment to plaintiff only on agency grounds but

found that there were no violations of the 1933 or 1934 acts; on cross appeal, plaintiff argued that violations by the employee of non-delegable duties created by the Acts should render his employer liable as well. The Ninth Circuit rejected this argument, holding that § 15 of the 1933 Act and § 20 of the 1934 Act were applicable, and that the good faith defenses provided therein were available to defendants.[3]

Similarly, in Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), it was indicated that liability for violations of Rule 10b–5 was governed by § 20, and not by any theories of agency. In SEC v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied, sub nom. McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), a receivership action, the court was careful to distinguish between liability under the Securities Exchange Act of 1934, which it held was governed by § 20 (citing Myzel v. Fields), and under agency principles.

■■■ While there is no case directly in point in this Circuit the recent decision of Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. April 26, 1973) (en banc) supports the conclusion that § 20(a), and not *respondeat superior,* is the appropriate standard for liability here. In his majority opinion in *Lanza,* Judge Moore specifically approved the Ninth Circuit's analysis of broker-dealer liability in *Kamen, supra,* "not in terms of the Rule but in terms of Section 20 of the 1934 Act." At 1301. And Judge Hays, in his separate opinion (joined by Judges Smith, Oakes and Timbers), would have found defendant Drexel & Co. liable under § 20(a), rather than on the theory of *respondeat superior* asserted by plaintiffs—citing Myzel v. Fields for this conclusion. At 1319–1320.

On its face, the statute would seem to cover this particular employer-employee situation, since it applies to *"every* person, who, *directly* or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder. . . ." (emphasis added). And the corresponding section of the 1933 Act (generally regarded as imposing a stricter standard of liability than § 20(a)—see III Loss, Securities Regulation 1747 (2d ed. 1961)) applies to *"Every* person who, by or through stock ownership, *agency* or otherwise . . . controls *any* person liable under sections 77k or 77l. . . ." (emphasis added).

The legislative history, while concerned primarily with the liability of directors, also indicates that this is the correct interpretation. Thus, in H.R. Rep.No.1383, 73d Cong. 2d Sess. 26 (1934) it is reported:

> "In this section and in section 11, when reference is made to 'control', the term is intended to include actual control as well as what has been called legally enforceable control. . . . It was thought undesirable to attempt to define the term. It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted."

To hold Lehman liable on a theory of *respondeat superior* would also do violence to the legislative intent underlying the Act. In the debates surrounding the 1934 amendments to the 1933 Act and the 1934 Act, the Senate had proposed an "insurer's liability" standard for controlling persons, while the House advanced what it termed a "fiduciary standard" akin to a duty to take due care. S.Rep. 47, 73d Cong. 1st Sess. 5 (1933) (The Fletcher Report); H.R.Rep. 85 *supra* at 5; H.R.Rep. 152 *supra* at 27.

---

3. Significantly, the Solicitor General of the United States filed an *amicus* brief on the original petition for certiorari, in which he argued that the controlling persons provisions "are irrelevant to the civil liability of the broker-dealer firm for the frauds of its employees. . . ."; the court in *Johns Hopkins, supra,* apparently adopted the arguments supporting this position. 297 F.Supp. at 1213 n. 29.

**1064**

The House version prevailed, leading to the ineluctable conclusion that:

> "The intent of Congress in adding this section [20], passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those . . . who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." Lanza v. Drexel & Co., *supra*, 479 F.2d at 1299.

 Insistence upon a standard of *respondeat superior* would result in the imposition of absolute liability upon broker-dealers in this context. Even in enforcement proceedings I believe there should be at least negligent conduct required before the imposition of liability. The jurisdiction of the SEC under § 10(b) is not without limits.

 The primary duty owed by a broker-dealer to the public is to supervise its employees in an adequate and reasonable fashion. See, e. g., Hecht v. Harris, Upham & Co., *supra*. In this Circuit especially, the standards defining this duty are recognized to be stringent. Moerman v. Zipco, Inc., 302 F. Supp. 439 (E.D.N.Y.1969), aff'd on opinion below, 422 F.2d 871 (2d Cir.), petition for rehearing denied by opinion, 430 F.2d 362 (2d Cir. 1970) (*per curiam*); Lanza v. Drexel & Co., *supra*. But to recognize more stringent standards for the exercise of control by a broker-dealer over its salesmen does not require the imposition of absolute liability upon the former for every violation of the latter. In fact, it would seem that the regulatory goals of the Commission could be at least substantially achieved by the enforcement of this duty, rather than by the attempt to read a non-existent insurer's liability into the statute for broker-dealers. Every violation of Rule 10b–5 by a salesman does not necessarily imply a breach of the employer's duty to supervise. As Judge Moore asserted in Lanza v. Drexel & Co.,

"... we are aware that the Rule must be read flexibly, not technically and restrictively. But reading the Rule flexibly does not relieve us of the obligation to define the limits of liability imposed by the Rule and to adhere to common sense. Where a claim is made that is clearly beyond the scope of the Rule, even flexible reading will not legitimize that claim." 479 F.2d at 1299.

### 2. Lehman's alleged failure to supervise

The SEC argues that Lehman breached its duty as a broker-dealer to supervise its salesmen by permitting Simon to maintain such close contact with the management of Lum's while his clients were holding large quantities of Lum's stock and debentures. Simon's position surely was fraught with potential conflicts of interest—as Lehman itself recognized in refusing to permit Simon to join the board of Lum's. At the time of the transactions in question, Lehman had no rules relating to contacts of salesmen with issuers; plaintiff contends that Lehman should have known that inside information would likely be volunteered to, and perhaps inadvertently forwarded by, Simon.

On the other hand, Lehman established at trial through several witnesses that it maintained at the time a compliance department, staffed by several competent and experienced attorneys, whose responsibility it was to maintain a comprehensive supervisory system for the entire organization. In this regard, compliance personnel would periodically visit the offices of Lehman and meet the salesmen to discuss problems of dealing with inside information and other matters. In addition, memoranda were regularly circulated to keep all personnel current on new developments in the field. Lehman also distributed to all of its branch offices a book of guidelines or supervisory procedures (SEC Exhibit 69), as well as a video tape concerning Rule 10b–5 problems. (Lehman Exhibit

AE). Robert F. Shapiro, a partner of Lehman Brothers and senior director of Lehman Brothers, Inc., testified that, in sum, the firm was insistent that the entire sales and distribution organization be kept apprised of the securities acts and the means of compliance therewith.

Although Lehman might have been put on notice of the potential conflict inherent in Simon's particular relationship with Lum's, it is difficult to determine what other supervisory procedures could have been implemented to prevent the isolated, ambiguous "leak" which did occur—short of imposing a rule that salesmen are not to contact the management of companies whose stocks are held by clients. In February, 1970 after notification of the alleged violation, Lehman indeed promulgated such a rule, which continues in effect at present.

The issue, then, is whether the absence of such a rule in January, 1970 is sufficient to render Lehman somehow "culpable" and therefore liable for the violation of Rule 10b–5 by Simon. Whether this alleged failure to supervise vitiates the "good faith" defense provided under § 20(a), see Hecht v. Harris, Upham & Co., *supra,* or whether it constitutes sufficiently negligent conduct to render Lehman directly liable as a participant according to the SEC, doubtless are two different ways of phrasing the same question.

■■■ Although the issue is close, I find that Lehman Brothers acted in good faith at all times and did not directly or indirectly induce Simon's breach. From this, it would seem to follow that Lehman cannot be considered to be liable directly as a participant. Lehman had no actual or constructive knowledge that Simon would pass along the information volunteered to him by Chasen. Even the subsequent trip by Kimpton to Las Vegas was made without authorization by any Lehman principal, and indeed met with a reprimand by Mr. Walter Scott, the manager of the Chicago office. Nor did Lehman execute the IDS sale or receive a commis-

sion for it. Simon was a respected and trusted employee, with substantial responsibility; I find that it was reasonable for Lehman to rely on his best judgment after taking all adequate steps to educate him as to the potential liability he faced for abuse of inside information.

Although the potential conflicts inhering in Simon's relationship with Lum's are obvious and, in hindsight, unfortunate, I am unwilling to impose hindsight liability solely based on the absence of any rule prohibiting such relationships. In January, 1970, Rule 10b–5 had not evolved to its present status; as Shapiro testified, moreover, Lehman had simply not "focused" on the problem of employee contacts with management. Nor, for that matter, had any other broker-dealer or regulatory agency. Shapiro also testified that Lum's was the first situation he had ever known about where such a relationship was maintained. This "lack of focus" is clearly comprehensible in what was and is a murky area of the law.

Given the unique circumstances outlined above, and considering the isolated chain of disclosures, which resulted in the IDS sale, I cannot say that Lehman either induced Simon's actions or failed to supervise him according to the stringent standards discussed heretofore. Therefore, I find that Lehman Brothers is not liable as alleged.

### Injunctive Relief

■■■ In the *ad damnum* clause of its complaint, the SEC prays that permanent injunctions be entered against the defendants. As noted previously, Sit, Jundt, Simon and IDS have consented to the entry of injunctions against themselves. Since it has been ruled that Lehman is not liable, injunctions theoretically could be lodged only against Chasen and Lum's. The conclusion that they violated section 10(b) and Rule 10b–5, however, does not end this court's inquiry. In fashioning relief in an enforcement proceeding, it must also be

determined " . . . whether there is a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., *supra*, 458 F.2d at 1100. While recognizing the dominance of the public interest in such a proceeding " . . . a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *Ibid.* at 1102. In *Manor Nursing*, the salient factors leading to the granting of an injunction were the past fraudulent conduct of the defendants and the blatant violations of the antifraud provisions of the securities acts, along with their continued claims of innocence and their lack of sincerity.

There is testimony in the record indicating that, after the acquisition of Caesar's Palace, there were problems with the disclosure by Lum's officers or employees of the "net win" results of the casino. A letter from Lum's counsel dated November, 1969, cautions that such leaks would be leaks of inside information. Yet on October 13, 1969, Chasen apparently called Sit and reported to the latter the net win for the first ten days of that month. After the cessation of trading in Lum's on January 9, moreover, Chasen in his conversation with the people at IDS proceeded to disclose additional net win information which does not appear in the press release.

It must also be noted that the original oral projections made by Chasen at the November seminar were not based on a careful, factual analysis of the company's position: rather, they were the product of a cursory review of draft projections which themselves were subsequently questioned by Chasen and ultimately revised downwards by a factor of 20%. Such conduct itself would indicate a possible violation of the statutes in question.

The particular violation in question was rather flagrant: the materiality and confidentiality of the projection revisions were apparent to all. Yet evidently one of Chasen's first reactions was to inquire of counsel whether he could warn Simon. I have already noted the perils of this selective treatment of investors in the market; it would appear that the disclosure represented at best was a rather negligent practice of handling corporate information which carried with it a clear danger of injury to the public.

Chasen is no longer with Lum's and according to him does not have any contact with the investment community. At the same time, he is a vice-president of ARA Services, Inc., a diversified food vending concern which is listed on the New York Stock Exchange. In such a position, it is possible, if not likely, that he would from time to time be in receipt of inside corporate information.

Although acting on the advice of counsel is a factor to consider in granting or withholding an injunction, SEC v. Manor Nursing Centers, Inc., *supra*, 458 F.2d at 1102, it is only a factor. Weighing this against the details of Chasen's own involvement in the violation established here, his past practices and his continued protestations of innocence, I find that the SEC and the public are entitled to an order enjoining Chasen from future violations of Rule 10b–5 and section 10(b).

To a considerable extent, Chasen's actions can also be imputed to Lum's, for he was the chief executive officer at all relevant times. In addition, it appears that other principals were also involved in the selective dissemination of corporate information: thus, for example, Earl Powell had told several analysts that second quarter results would not be as good for fiscal 1970 as they had been for the record previous year or quarter. It should also be recalled that Lum's management decided to delete the reference to Simon in the initial letter to the New York Stock Exchange after the

events of January 8 and 9—while denying that the corporation had done anything wrong.

As for the likelihood of subsequent repetitions of this type of conduct, Lum's (or more properly in this context, Caesar's World) contends that it now has a policy of authorizing only the company's president, secretary and general counsel, and the chairman of the board to communicate with the investment community. These three individuals are quite experienced in the field of securities law, and were not involved in the practices described above. A public relations firm is also utilized to make information available on an equal basis to all who inquire, and press releases are issued promptly informing the public of any major developments. At the same time, Lum's has no written guidelines for management's dealings with the investment community, or their disclosure of corporation information. And the principal source of revenue for the company, Caesar's Palace, continues to be subject to the wide swings in casino winnings and thus to the speculation which it engenders.

I am inclined to agree with plaintiff that the precautions and policies described above are inadequate under the circumstances, particularly where there have been problems with leaks of corporate information on several occasions and protestations of innocence concerning the instant violation. In sum, I find that there is a reasonable likelihood that 10b–5 violations will be repeated, even if only inadvertently. Lum's (Caesar's World) should be enjoined from violating the securities acts in such manner in the future, and it should be directed to establish written guidelines for the dissemination of corporate information to the investment community.

Settle judgments in accordance with the foregoing, which shall be deemed findings of fact and conclusions of law. Rule 52, F.R.Civ.P. It is so ordered.